Hillsborough,
No. 4285.

ELBA CHASE NELSON

*v.*

LOUIS C. WYMAN, *Attorney General.*

Argued January 22, 1954.

Decided April 30, 1954.

*McLane, Davis, Carleton & Graf* and *Stanley M. Brown* (*Mr. Brown* orally), for the plaintiff.

*Louis C. Wyman,* Attorney General, *Warren E. Waters,* Deputy Attorney General, *George F. Nelson, Arthur E. Bean, Jr., Richard C. Duncan,* Assistant Attorneys General, *Elmer T. Bourque,* Law Assistant, and *Stuart Conner,* Special Assistant to the Attorney General (*Mr. Wyman* orally), for the defendant.

GOODNOW, J.  Under the provisions of a joint resolution adopted by the Legislature of this state in 1953 (Laws 1953, c. 307), the Attorney General was authorized and directed "to make full and complete investigation with respect to violations of the subversive activities act of 1951 and to determine whether subversive persons as defined in said act are presently located within this state."  In connection with this investigation, the Attorney General was authorized "to require by subpoena . . . the attendance of such witnesses and the production of such . . . documents . . . as he deems advisable" and "to make public such information received by him, testimony given before him, and matters handled by him

as he deems fit to effectuate the purposes of this resolution." He was directed "to proceed with criminal prosecutions under the subversive activities act whenever evidence presented to him in the course of the investigation indicates violations thereof" and to "report to the 1955 session . . . the results of this investigation, together with his recommendations, if any, for necessary legislation." As a preliminary to the investigation to be conducted by him under this resolution, the Attorney General adopted certain rules of procedure, a copy of which was given to the plaintiff when she was summoned to appear as a witness. These rules provide in part that the examination of witnesses shall be in executive session except in extraordinary circumstances, unless a public hearing is requested by the witness, and that "in lieu" of a public hearing, the transcript of the testimony of witnesses who invoke the self-incrimination privilege will be made public. During his questioning of the plaintiff, the defendant inquired concerning her membership in certain organizations and her activities in other respects on dates prior to the effective date of the 1951 act. By her exceptions, the plaintiff questions the authority of the defendant to make rules, to hold public hearings or publicize testimony and to inquire concerning matters which occurred prior to 1951 and challenges the validity of the resolution if it permits such publicity as is provided by the defendant's rules and orders or empowers him to inquire as to pre-1951 matters. A consideration of these issues requires first a determination of whether the investigation provided for by this resolution is a legislative inquiry or a criminal inquisition.

It is now clearly recognized that the Legislature has broad and extensive powers to investigate and inquire. *Opinion of the Justices,* 96 N. H. 530, 531; *State v. Superior Court,* 40 Wash. (2d) 502; see *Tenney v. Brandhove,* 341 U. S. 367, 377; *United States v. Rumely,* 345 U. S. 41. The investigation provided for by this resolution is concerned with potential threats to the existing machinery of government through subversive activities. Such a subject matter is one of which the Legislature has jurisdiction "not alone for the selfish reason of self-protection, but for the basic reason that having been established by the people as an instrumentality for the protection of the rights of people, it has an obligation to its creators to preserve itself." *Barsky v. United States,* 167 F. (2d) 241, 246; *Dennis v. United States,* 341 U. S. 494, 501. It is of little importance that the resolution in this case fails to

state in explicit terms the use to which the Legislature intends to put the information gained by it from the investigation since it plainly relates to a subject matter into which the Legislature has authority to inquire. *McGrain* v. *Daugherty*, 273 U. S. 135, 178; *In re Chapman*, 166 U. S. 661, 670. It specifically directs the Attorney General to report to the Legislature the results of this investigation and his recommendations as to any necessary legislation, thus indicating with sufficient clarity a legislative purpose that a subject matter properly within its jurisdiction be investigated with a view to providing it with information upon which further action by it may be predicated.

The fact that the resolution requires an investigation with respect to violations of law as well as a determination of "whether subversive persons as defined in said act are presently located within the state" does not remove the inquiry from the category of a legislative investigation. The inquiry is not confined to an investigation of violations of the act but includes a determination of whether there are presently in this state those persons whose acts are not criminal but who are classified as subversive persons because they either, not "knowingly and willfully", are committing, attempting to commit, or aiding in the commission of acts intended to overthrow or alter existing government by force or violence (Laws 1951, *c*. 193, *s*. 2), or are advocating or teaching the commission of such acts even though they do not do so "knowingly and willfully . . . under such circumstances as to constitute a clear and present danger" or are members of subversive organizations not knowing them to be such (*ss*. 1, 3).

So far as it requires an "investigation with respect to violations" of the act, the resolution in effect seeks to discover through inquiry whether violations of the 1951 act have occurred and if so the nature and extent of such violations, not merely the identity of those who have violated it. It is not alone when specific violations of the act are evidenced by that proof required for criminal indictment that a report thereof is to be made. If information is acquired which points to the existence of violations of the act, by persons known or unknown, with sufficient clarity to form a basis for decision as to future legislative action, the Legislature is to be informed. *Bowers* v. *United States*, 202 F. (2d) 447, 448. The resolution is not aimed at providing assistance in the criminal prosecution of a particular individual (See *Ward Baking Co.* v. *Western Union Telegraph Co.*, 205 N. Y. App. Div. 723) or those

involved in a particular criminal occasion. Having made certain acts unlawful and having classified certain persons as subversives by its 1951 act, the Legislature seeks through this investigation to secure general information as to the results of that legislation. In the course of the investigation, information will be sought from witnesses upon which such facts can be determined. No sound basis can exist for denying to the Legislature the power to so investigate the effectiveness of its 1951 act even though, as an incident to that general investigation, it may be necessary to inquire as to whether a particular person has violated the act. *Eggers* v. *Kenny*, 104 A. (2d) 10 (N. J. 1954); *State* v. *Superior Court*, 40 Wash. (2d) 502; *Attorney General* v. *Brissenden*, 271 Mass. 172. When the investigation provided for is a general one, the discovery of a specific, individual violation of law is collateral and subordinate to the main object of the inquiry. *Matter of Di Brizzi*, 303 N. Y. 206, 216. The existence of such a possibility does not change the investigation from a legislative to a criminal one.

Having determined that an investigation should be conducted concerning a proper subject of action by it, the Legislature's choice of the Attorney General as its investigating committee, instead of a committee of its own members or a special board or commission, was not in and of itself determinative of the nature of the investigation. His position as the chief law enforcement officer of the State did not transform the inquiry which was otherwise legislative into executive action. When the Legislature chooses to delegate its power of inquiry for the purpose of ascertaining facts upon which it may decide to take action, we see no distinction in principle between the delegation of that authority to the Attorney General and its delegation to a committee or board. *Attorney General* v. *Brissenden*, 271 Mass. 172.

Some stress is laid upon the directive contained in the resolution that the Attorney General shall "proceed with criminal prosecutions under the subversive activities act whenever evidence presented to him in the course of the investigation indicates violations thereof" as expressive of a legislative purpose that the investigation be a criminal inquiry. Without such a directive, this duty plainly devolved upon the Attorney General, whether the evidence was secured by him personally through the investigation, relayed to him from an investigation conducted by others, or received by him from any other source. The Legislature's purpose that the

Attorney General should "report to the 1955 session . . . the results of this investigation, together with his recommendations, if any, for necessary legislation" is clearly expressed. The additional directive concerning prosecution of discovered violations neither adds to nor subtracts from the plainly worded purpose for which the Legislature caused the investigation to be made. *McGrain* v. *Daugherty*, 273 U. S. 135.

Among the matters as to which the Attorney General was directed to inquire were the commission of, or attempts to commit, acts intended to overthrow the government by force or violence after August 1, 1951, whether or not done "knowingly and willfully," the advocacy or teaching of the commission of such acts after August 1, 1951, whether or not done "knowingly and willfully" or "under such circumstances as to constitute a clear and present danger to the security of" the State or Nation, and membership in any defined subversive organization after November 1, 1951. The authorization to seek information concerning conduct during the period since 1951 did not limit to the same period the time concerning which witnesses could be interrogated but carried with it by clear implication the authority to inquire concerning any matters relevant and pertinent to the main object of the investigation, whether occurring before or after 1951. Evidence concerning a witness' membership, and the identity of others who held membership, in a subversive organization before its classification as such in 1951 is clearly relevant to an inquiry directed to the determination of whether there are persons now in this state who are members of such an organization. Similarly, the committing of acts "intended to overthrow, destroy or alter . . . the government . . . by force or violence" or the advocacy or teaching of such acts prior to 1951 may have some probative value, combined with other evidence, in determining whether such conduct has continued since that year. *Marcoux* v. *Collins*, 94 N. H. 345, 347. The inquiries of the defendant concerning the commission of such acts and membership in such organizations prior to 1951 were not a part of an unauthorized general inquiry into subversive activities but were pertinent to the main object of the investigation and fell within the authority granted by the resolution.

We cannot agree with the plaintiff that "the real purpose of inquiring into the pre-1951 era" was "an effort . . . to engage in entrapment for perjury." While the period encompassed by the

interrogation of the plaintiff extended for many years prior to 1951, the questions were concerned with her membership in the Communist party and her activities in aid of that party and were therefore material to the determination of whether she was at the time of questioning a member of a subversive organization and whether she had participated in the management or contributed to the support of a subversive organization since 1951.

The subversive activities act (Laws 1951, c. 193) provides that as to the records of information required to be maintained by the Attorney General, such of them "as may reflect on the loyalty of any resident of this state shall not be made public . . . except with the permissions of the attorney general to effectuate the purposes hereof." S. 7. The 1953 resolution (Laws 1953, c. 307) makes this provision "inapplicable to the investigation provided for herein" and authorizes the Attorney General "to make public such information received by him, testimony given before him, and matters handled by him as he deems fit to effectuate the purposes of this resolution."

In stipulating what testimony might be made public, the resolution referred to that which had been given rather than to the giving of testimony and limited the testimony which might be made public to that which was deemed fit by the Attorney General to effectuate the purposes of the resolution. No authority was granted to hold public hearings. The prohibition against publicity of information reflecting upon the loyalty of any resident was relaxed but not to the point of authorizing the indiscriminate publication of testimony without thought of the consequences or benefits of such public disclosure. Because of the hardship likely to be imposed by irresponsible publicity reflecting upon the loyalty of the residents of this state which the Legislature had recognized in the 1951 act, it limited the testimony which might be made public by the Attorney General to that which he deemed fit to effectuate the purposes of the resolution. It is not feasible for him to exercise this discretion during the giving of testimony at a public hearing but only after testimony has been taken in private and its fitness to effectuate the purposes of the resolution has been weighed. Once he has properly exercised that discretion, no restriction is imposed upon him to prevent the publication of any part of the entire testimony. The discretion granted to him extends to the whole of the testimony, but by permitting only the publication of that part which will effectuate the purposes of the resolution,

the resolution requires the withholding of such parts as will not.

The investigative power of the Legislature, however penetrating and persuasive its scope, is not an absolute right but, like any right, is "limited by the neighborhood of principles of policy which are other than those on which [that] right is founded, and which become strong enough to hold their own when a certain point is reached." *United States* v. *Rumely*, 345 U. S. 41, 44; *Hudson Water Co.* v. *McCarter*, 209 U. S. 349, 355. The contending principles involved here are those underlying the power of the Legislature to investigate on the one hand and those upon which are based certain individual rights guaranteed to our citizens by the State and National Constitutions.

The plaintiff asserts that the inquiry permitted by the resolution concerning her conduct and membership in certain organizations, both before and after August 1, 1951, was a deliberate invasion of her right of privacy for no valid purpose and thus raises the issue of whether the object of the legislative investigation with which we are concerned is such as to justify an intrusion upon her right to be let alone. Policy making is not the function of the courts. *Chronicle &c. Pub. Co.* v. *Attorney General*, 94 N. H. 148, 151. The reconciliation of competing interests is the business of the Legislature and the balance it strikes "is a judgment not to be displaced by ours, but to be respected unless outside the pale of fair judgment." *Dennis* v. *United States*, 341 U. S. 494, 540. By its 1951 act (Laws 1951, c. 193), the Legislature recognized the existence of a "World Communist movement . . . having as its objective the establishment of totalitarian dictatorship" which "is the complete antithesis of the American constitutional form of government" and which seeks to establish itself throughout the world through subversive groups and by violent and unlawful means. For "the preservation of the state," is established definitions of subversive persons and organizations and made criminal certain acts concerned with the overthrow of government by force and violence. It cannot be doubted that the Legislature has the power to act in order to protect the government against its overthrow in this manner. *Dennis* v. *United States*, 341 U. S. 494, 501.

Through the investigation authorized by the 1953 resolution (Laws 1953, c. 307), the Legislature sought to determine whether the 1951 act had been effective in curbing subversive activities and membership in subversive organizations. Inherent in its power to legislate on the subject lay the power to investigate the results

of its legislation, which it deemed wise to exercise. It seems unnecessary to recount the events which have occurred, both within and without this country, in recent years indicative of the nature and purposes of the Communist party and the means employed by it, its supporters and its dupes, in seeking its ends. Suffice it to say that in the light of those events, it is unthinkable that this court should now reject as "outside the pale of fair judgment," the Legislature's decision to inquire of residents concerning activities aimed at the overthrow of government by force and violence, whenever they occurred, and membership in organizations now classified as subversive, both before and after 1951. In the judgment of the Legislature, the interest of the State in acquiring this information overrides and justifies the intrusion upon any right of privacy which the plaintiff may have as a judicially determined incident to other rights guaranteed to her by our Constitutions. *In re Chapman,* 166 U. S. 661, 669; see *State* v. *Superior Court,* 40 Wash. (2d) 502, 514.

A sharper conflict of principles occurs in connection with the plaintiff's claim that the resolution is invalid in that it places no limit upon the persons who may be summoned and questioned concerning activities after August 1, 1951, and permits the publication of certain testimony, particularly since those powers are granted to the individual who is also charged with the prosecution of all felonies including violations of the 1951 act.

The broad authority given by the resolution under which even persons who are suspected of violating the criminal provisions of the 1951 act may be required to appear as witnesses is not improper. As we have previously pointed out in this opinion, the investigation is general and seeks, among other things, information as to whether violations of the 1951 act have occurred. No provision is made for any accusation of crime as a part of the investigation. Article 15 of the Bill of Rights which provides that "No subject shall . . . be compelled to accuse or furnish evidence against himself" extends the privilege against self-incrimination to those who are called as witnesses before a legislative investigation and choose to exercise it but it does not excuse them from subpoena and examination. Had the defendant sought to compel the plaintiff to testify without regard to her privilege against incrimination, which he did not, his action would have been violative of her rights in the absence of a grant of immunity from prosecution such as is sometimes authorized by the Legislature when the acquisition of

information is deemed of sufficient importance. See R. L., *c.* 287, as amended by Laws 1951, *c.* 203, *s.* 16. The fact that such a grant of immunity was not included in the present resolution does not make it illegal to summon and inquire of those who may exercise the privilege against self-incrimination nor does it indicate any intention on the part of the Legislature that such persons should not be so questioned.

We see no impropriety in permitting the Attorney General, under powers delegated by the Legislature, to question the plaintiff concerning activities violative of the 1951 act which are the subject matter of this legislative investigation simply because she is liable to prosecution by him in his executive capacity if she has violated the law. Her several assertions of the privilege against self-incrimination in response to his questions were at all times recognized and respected and furnished no information of any possible use to him in the event of any later criminal prosecution of her. Her claims of the privilege accomplished exactly what they were intended to accomplish and protected her rights exactly as they were intended to do. The fact that a witness appearing before a grand jury is able to claim such a privilege without public notoriety does not establish that he should be so protected in claiming it in connection with this investigation. The privacy afforded to such a witness is not the primary reason for the secrecy with which grand jury proceedings are surrounded. *State* v. *Canatella,* 96 N. H. 202, 204; *State* v. *Wood,* 53 N. H. 484, 493; VIII Wig. Ev. (3d *ed.*) 722. There is no constitutional guarantee that one who sees fit to exercise the privilege against self- incrimination shall be entitled to do so in private and without notoriety.

The plaintiff urges that in granting to the Attorney General the power to publish testimony of witnesses concerned with matters violative of the act after 1951, the Legislature has completely disregarded such a witness' right to due process of law (Const. Pt. I, *Art.* 15th) and has permitted the infliction of cruel and unusual punishment (*Id., Art.* 33d). This argument centers around the Legislature's grant, and the Attorney General's exercise, of authority to publish the testimony of any witness, limited only by a determination of whether such publication will "effectuate the purposes of this resolution."

Because of the part which public opinion plays in the legislative process, and the possibility that publication of the testimony of one witness may lead to discovery of others in a position to affirm,

supplement or contradict such testimony, the Legislature must be deemed to have the delegable power to make such testimony public, as an incident of its power to investigate matters within the scope of its legislative duties. That power, however, may not be used to restrict the free exercise of the rights of witnesses who are compelled to testify.

The inquiry to be made by the Attorney General relates to matters both criminal and non-criminal. Publication of the answers of a witness questioned as to material but non-criminal matters, such as participation in certain organizations before 1951, may tend to bring upon the witness some public censure and by interference with such right as he may have to be let alone and by injury to his reputation may inflict damage which the plaintiff has characterized as "cruel and unusual punishment." Publication is not for these reasons however to be forbidden. See *McCollum* v. *Board of Education*, 333 U. S. 203, 233.

The granted power to publish testimony in any case is not absolute or to be exercised indiscriminately; but where accomplishment of the public purpose outweighs the harm to the individual, exercise of the power is lawful. Citizens have no right to protection from inconvenience, from monetary loss or even from public embarrassment, to the unreasonable detriment of the legislative right to obtain information which may be pertinent to "the promise of protection to each member of the community by the twelfth article of the bill of rights." *Boston & Maine R. R.* v. *State*, 75 N. H. 513, 516. See also, *Marceau* v. *Company*, 97 N. H. 497, 499, 500. The only exemptions from the rule that "persons summoned as witnesses by competent authority have certain minimum . . . obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery" are those which have "been found, through centuries of experience, to outweigh the public interest in the search for truth." *United States* v. *Bryan*, 339 U. S. 323, 331.

A witness who is examined concerning conduct of his own since 1951 which may have violated the law, or tends to show such violation, must either deny the conduct, incriminate himself, or invoke his privilege against self-incrimination. *Cf. Marcello* v. *United States*, 196 F. (2d) 437, 443. While such a witness is not "accused" as a criminal, his rights, if he has violated the criminal law, may not be disregarded upon the ground that he is merely a witness. It is the plaintiff's position that the authority vested in

the Attorney General with respect to publicity enables him to extract confessions, or to inflict cruel and unusual punishment through the medium of damaging publicity, thus depriving witnesses of due process of the law, and preventing them from obtaining a fair trial if subsequent criminal proceedings should be instituted.

As previously noted, the Legislature did not authorize publication of all information obtained by the Attorney General, but only of such information or testimony as he should deem fit to effectuate the purposes of the resolution. Only to the extent that such publication would be reasonably likely to produce further information on the subject matter of the investigation is the Attorney General authorized to publish. If public information that a witness has claimed the privilege against self-incrimination may reasonably be thought likely to produce this result, the power may be exercised; but discretion must be exercised with reference to the circumstances of the individual case, and not by predetermined rule.

For this reason we think invalid the rule by which the Attorney General advises witnesses that "whenever the witness claims the privilege against self-incrimination and refuses to answer questions relating to subversive activities . . . the transcript of testimony taken in executive session will be made public." Such a rule gives no effect to the limitations placed upon the power granted by the Legislature. Furthermore the freedom of a witness to exercise the constitutional privilege may not be hampered by the prior restraint or deterrent of notice that publicity will be given to its exercise, but not to its waiver. Nor can it be determined categorically that the publication of all claims of the privilege is reasonably likely to "effectuate the purposes" of the resolution.

The examination of witnesses is properly to be conducted in executive session, unless the witness requests otherwise. See *Delaney* v. *United States,* 199 F. (2d) 107, 114; *Dunham* v. *Ottinger,* 243 N. Y. 423. The right to conduct the proceedings in public against the wishes of the witness if "extraordinary circumstances" are thought to exist, does not fall within the scope of the authority granted, since by its nature a public hearing would prevent the proper exercise of the discretion which the Attorney General is required to use. The resolution contains no directive, express or implied, which allows the Attorney General to smoke out and expose to public scorn or ridicule those who decline to assert their loyalty to existing forms of government, although such

a purpose is implied in his assertion before us that "the general public . . . have the right to know who among them decline to answer questions directly related to their loyalty."

The plaintiff's suggestion that publication of information within the limitations imposed by the resolution will prevent a fair trial in the event of subsequent criminal proceedings is not thought to affect the validity of the resolution or to establish a violation of any constitutional right. The risk, if there is one, may be adequately dealt with by continuance of the trial or other means, when the occasion arises. See *Delaney* v. *United States*, 199 F. (2d) 107, *supra*.

We conclude that the grant of authority to publicize information or testimony within the limits hereinbefore indicated violates no provision of the Constitution, and that the plaintiff's rights have been protected through her own invocation of her constitutional privilege.

The subversive activities act of 1951 (Laws 1951, *c*. 193) deals in one part with definitions of and penalties for sedition and subversive activities and in the other with certain loyalty requirements applicable to those who are employed by the State or who seek to become candidates for election to public office. Since the plaintiff claims no violations of her rights under the loyalty provisions (*ss*. 9-15), the occasion for an adjudication with regard to them does not arise in this case. *Petition of Turner*, 97 N. H. 449, 451. The remaining sections of the act, however, are the basis for the investigation authorized by the Legislature and were the subject matter of inquiries made of the plaintiff. She contends that section 3, which is concerned with membership in a subversive organization or a foreign subversive organization, fails to define a criminal act with sufficient definiteness to meet the essential requirements of due process and is invalid.

The act (*s*. 1) defines a subversive organization as one "which engages in or advocates, abets, advises, or teaches" or a purpose of which is to thus support or to assist in "activities intended to overthrow, destroy or alter . . . the constitutional form of the government . . . by force, or violence." An organization which is "directed, dominated or controlled . . . by a foreign government" and which thus supports or a purpose of which is to thus support or to assist in "activities intended to overthrow, destroy or alter" the government, and "to establish in place thereof any form of government the direction and control of which is to be vested in,

or exercised by or under, the domination or control of any foreign government, organization or individual" is a foreign subversive organization. Organizations having as their *bona fide* purpose the promotion of world peace by alliances or unions with other governments through constitutional means are specifically excluded from the definition. Section 3 provides that "It shall be a felony for any person after August 1, 1951 to become, or after November 1, 1951 to remain a member of a subversive organization or a foreign subversive organization knowing said organization to be a subversive organization or foreign subversive organization."

The plaintiff argues that one "constitutional difficulty with the Act is that it makes membership in a certain type of organization a crime, but there is no way of telling whether the organization is proscribed . . . until the jury trying the accused first decides whether the organization is subversive and then decides whether the person is or was a member." Her position in this respect is unsound. The statute does not penalize members unless it appears beyond a reasonable doubt that they became or remained such "knowing said organization to be a subversive organization." If they have that knowledge, which must be knowledge of its unlawful activity or purpose (see *Bridges* v. *Wixon*, 326 U. S. 135; *De Jonge* v. *Oregon*, 229 U. S. 353), they are adding their weight to the accomplishment of the forbidden purpose or activity whether actually approved by them or not. *Dunne* v. *United States*, 138 F. (2d) 137, 143, cert. den., 320 U. S. 790. An organization may be found to be subversive only if the evidence indicates beyond a reasonable doubt that its activities or purposes are those which are plainly defined in the statute. Persons who may be subject to the statute are clearly informed that if they join or continue membership in an organization which engages in those definitely described activities or which has those purposes that classify it as subversive, knowing that such are its activities or purposes, they are liable to its penalties. *Whitney* v. *California*, 274 U. S. 357, 368. The fact that the knowledge on the part of the accused which is an essential element of the crime is concerned with the thought processes of the accused and is not capable of direct proof by objective evidence does not invalidate the statute. "The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis* v. *United States*, 341 U. S. 494, 500.

However meritorious may be the plaintiff's suggestion that provision should be made by statute for an administrative determination that an organization is subversive and for explicit procedures by which persons may disassociate themselves from such an organization, it should properly be addressed to the Legislature. The absence of such a provision in the present act does not affect its validity. The acts which the statute prohibits are the joining of an organization *with knowledge* of its proscribed activities or purposes and the continuance in membership *with knowledge* of such activities or purposes. The issues to be met before the jury are clear. *State* v. *Langelier*, 95 N. H. 97, 99. Due process does not require that the character of an organization be determined and publicized before the imposition of penalties upon those belonging to or joining it. Those who have knowledge of its character need no official determination or notice of it; those who lack that knowledge do not violate the statute by their membership. Nor does the failure of the statute to provide a specific method for disassociation indicate a presumption of continuance of membership and thereby violate the right of due process. Whether membership in an organization has been terminated in good faith is not determined on the basis of a single fact such as some official act of the organization but upon all of the evidence. A decision as to whether a person has joined or remained a member of an organization with knowledge of its character is one which is well within the capabilities of a jury.

It is also urged by the plaintiff that the constitutionality of federal legislation of a character comparable to that adopted in this state (*Dennis* v. *United States*, 341 U. S. 494) is not determinative of the validity of the State legislation. In this connection she points out that the danger posed by sedition and subversive activities is one which involves the nation rather than this state and that the exclusively federal duty to make provision for military security and to handle international affairs as well as the obligation to "provide for domestic tranquility" and to "guarantee to every state . . . a republican form of government" may well justify and sustain such federal legislation. Whatever importance has been ascribed to these duties and powers in decisions dealing with federal legislation, their existence has not been applied, in connection with State legislation, to exclude consideration of the well recognized power of each state to regulate the conduct of its citizens and to restrain activities which are detrimental not only

to the welfare of the State but of the Nation. "The State is not inhibited from making the 'national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes.'" *Gilbert* v. *Minnesota,* 254 U. S. 325, 331. "There is nothing in the Federal constitution in any way granting to the Federal government the exclusive right to punish disloyalty." *People* v. *Lloyd,* 304 Ill. 23, 33.

The enactment by Congress of the Smith Act (18 U. S. C. A. *s.* 2385), which defines and penalizes sedition and subversive activities against the government of the United States, the States or any of their subdivisions, does not preclude State legislation on the same subject matter. Insofar as *Commonwealth* v. *Nelson,* 104 A. (2d) 133, 141 (Pa. 1954), gives support to the proposition that it does, we do not adopt it. Police powers of the State are not superseded by federal legislation except where State action is either specifically prohibited or "that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230. The interest of the State, in the protection of which it now seeks to exercise its police power, is that "primary and essential right of self preservation; which, so long as human governments endure . . . cannot be denied" to it. *Gitlow* v. *New York,* 268 U. S. 652, 668. The Smith Act does not specifically exclude State action in support of this right and we do not believe that its provisions are such as to evidence a "clear and manifest purpose of Congress" to pre-empt the entire field of legislation and deny the State's right to act in defense of it.

Nor can we agree with the plaintiff's contention that there is no sufficient danger to the State to warrant its adoption of this type of legislation. Restriction of speech is invalid if the interest which the State is attempting to protect is itself too insubstantial. (*Dennis* v. *United States,* 341 U. S. 494, 508, and cases cited) but "overthrow of the Government by force and violence is certainly a substantial enough interest for the Government to limit speech." *Supra,* 509. In determining whether the State's interest is such that an infringement of freedom of speech would not be an unreasonable exercise of its police power, great weight must be given to the Legislature's determination that the advocacy of the overthrow of organized government by force and violence is so inimical to the general welfare and involves such danger of substantive evil that it should be penalized. *Gitlow* v. *New York,*

268 U. S. 652, 668. "Every presumption is to be indulged in favor of the validity of the statute." *Id.*, 668; *Chronicle &c. Pub. Co.* v. *Attorney General*, 94 N. H. 148, 151. If "the menace of communist subversion" is "in the main a danger national in scope" as contended by the plaintiff, and may be a matter of proper federal concern, the State has an interest of its own in the preservation of its government and is not required to rely solely upon the performance by the federal government of its duty to preserve the State's republican form of government. The Legislature cannot reasonably be required to defer the adoption of measures for its own peace and safety until there is a present and imminent danger that the advocated plan will be successful (*People* v. *Lloyd*, 304 Ill. 23) or until actual disturbances of the public peace occur (*Gitlaw* v. *New York, supra,* 669). We do not believe that the present statute is an unwarranted infringement of freedom of speech.

It is also strongly urged by the plaintiff that the Legislature of this state cannot proscribe activities looking to the overthrow of government by force or violence because of Article 10 of the Bill of Rights which provides, in part, that "whenever the ends of government are perverted, and public liberty manifestly endangered, and all other means of redress are ineffectual, the people may, and of right ought, to reform the old, or establish a new government. The doctrine of nonresistance against arbitrary power, and oppression, is absurd, slavish, and destructive of the good and happiness of mankind." With this interpretation we cannot agree. The right reserved to the people by this Article is not such a broad and unlimited right of insurrection and rebellion as to permit any group which is dissatisfied with existing government to lawfully attempt at any time to overthrow the government by force or violence. It is not claimed by the plaintiff that "the ends of government" are now "perverted . . . public liberty manifestly endangered, and all other means of redress . . . ineffectual" but it is only when those conditions prevail that the right to resist and to "reform the old, or establish a new government" exists. The right possessed by the people of this state as a protection against arbitrary power and oppression cannot be utilized to justify the violent overthrow of government when the adoption of peaceful and orderly changes, properly reflecting the will of the people, may be accomplished through the existing structure of government. *Dennis* v. *United States*, 341 U. S. 494,

501, 549. To require a government representative of the people, in the face of preparations for revolution by force, to refrain from acting to curb the outbreak of violence and to confine itself solely to holding answerable those persons who have committed crimes of violence and terrorized the community in the name of revolution must result in anarchy. *Dennis* v. *United States, supra,* 501. Article 10 was not intended to accomplish this result.

So far as the circumstances of this case have required an examination of the 1951 act, we conclude that it is constitutional upon its face, so as to furnish a basis for the resolution of 1953.

*Case discharged.*

All concurred.