## SWEEZY v. NEW HAMPSHIRE,
## BY WYMAN, ATTORNEY GENERAL.

No. 175.  Argued March 5, 1957.—
Decided June 17, 1957.

*Thomas I. Emerson* argued the cause for appellant. With him on the brief was *William L. Phinney.*

*Louis C. Wyman,* Attorney General of New Hampshire, argued the cause for appellee. With him on the brief were *Joseph F. Gall,* Special Assistant to the Attorney General, and *Elmer T. Bourque,* Assistant Attorney General.

MR. CHIEF JUSTICE WARREN announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE BRENNAN join.

This case, like *Watkins* v. *United States, ante,* p. 178, brings before us a question concerning the constitutional limits of legislative inquiry. The investigation here was conducted under the aegis of a state legislature, rather than a House of Congress. This places the controversy in a slightly different setting from that in *Watkins.* The ultimate question here is whether the investigation deprived Sweezy of due process of law under the Fourteenth Amendment. For the reasons to be set out in this opinion, we conclude that the record in this case does not sustain the power of the State to compel the disclosures that the witness refused to make.

This case was brought here as an appeal under 28 U. S. C. § 1257 (2). Jurisdiction was alleged to rest upon contentions, rejected by the state courts, that a statute

of New Hampshire is repugnant to the Constitution of the United States. We postponed a decision on the question of jurisdiction until consideration of the merits. 352 U. S. 812. The parties neither briefed nor argued the jurisdictional question. The appellant has thus failed to meet his burden of showing that jurisdiction by appeal was properly invoked. The appeal is therefore dismissed. Treating the appeal papers as a petition for writ of certiorari, under 28 U. S. C. § 2103, the petition is granted. Cf. *Union National Bank* v. *Lamb,* 337 U. S. 38, 39–40.

The investigation in which petitioner was summoned to testify had its origins in a statute passed by the New Hampshire legislature in 1951.[1] It was a comprehensive scheme of regulation of subversive activities. There was a section defining criminal conduct in the nature of sedition. "Subversive organizations" were declared unlawful and ordered dissolved. "Subversive persons" were made ineligible for employment by the state government. Included in the disability were those employed as teachers or in other capacities by any public educational institution. A loyalty program was instituted to eliminate "subversive persons" among government personnel. All present employees, as well as candidates for elective office in the future, were required to make sworn statements that they were not "subversive persons."

In 1953, the legislature adopted a "Joint Resolution Relating to the Investigation of Subversive Activities."[2] It was resolved:

"That the attorney general is hereby authorized and directed to make full and complete investigation with respect to violations of the subversive activities act of 1951 and to determine whether subversive

---

[1] N. H. Laws 1951, c. 193; now N. H. Rev. Stat. Ann., 1955, c. 588, §§ 1–16.

[2] N. H. Laws 1953, c. 307.

persons as defined in said act are presently located within this state. The attorney general is authorized to act upon his own motion and upon such information as in his judgment may be reasonable or reliable. . . .

.        .        .        .        .

"The attorney general is directed to proceed with criminal prosecutions under the subversive activities act whenever evidence presented to him in the course of the investigation indicates violations thereof, and he shall report to the 1955 session on the first day of its regular session the results of this investigation, together with his recommendations, if any, for necessary legislation." [3]

Under state law, this was construed to constitute the Attorney General as a one-man legislative committee.[4]

---

[3] The authority of the Attorney General was continued for another two-year period by N. H. Laws 1955, cc. 197, 340.

[4] "Having determined that an investigation should be conducted concerning a proper subject of action by it, the Legislature's choice of the Attorney General as its investigating committee, instead of a committee of its own members or a special board or commission, was not in and of itself determinative of the nature of the investigation. His position as the chief law enforcement officer of the State did not transform the inquiry which was otherwise legislative into executive action." *Nelson* v. *Wyman,* 99 N. H. 33, 38, 105 A. 2d 756, 762–763.

The Attorney General of New Hampshire is appointed to office by the Governor and the State Council, a group of five persons who share some of the executive responsibilities in the State Government. The principal duties of the Attorney General are set forth in N. H. Rev. Stat. Ann., 1955, c. 7, §§ 6–11. He represents the State in all cases before the State Supreme Court. He prosecutes all criminal cases in which the accused is charged with an offense punishable by twenty-five years in prison or more. All other criminal cases are under his general supervision. He gives opinions on questions of law to the legislature, or to state boards, departments, commissions, officers, etc., on questions relating to their official duties.

He was given the authority to delegate any part of the
investigation to any member of his staff. The legislature
conferred upon the Attorney General the further author-
ity to subpoena witnesses or documents. He did not have
power to hold witnesses in contempt, however. In the
event that coercive or punitive sanctions were needed,
the Attorney General could invoke the aid of a State
Superior Court which could find recalcitrant witnesses
in contempt of court.[5]

Petitioner was summoned to appear before the Attor-
ney General on two separate occasions. On January 5,
1954, petitioner testified at length upon his past conduct
and associations. He denied that he had ever been
a member of the Communist Party or that he had
ever been part of any program to overthrow the govern-
ment by force or violence. The interrogation ranged
over many matters, from petitioner's World War II mili-
tary service with the Office of Strategic Services to his
sponsorship, in 1949, of the Scientific and Cultural
Conference for World Peace, at which he spoke.

During the course of the inquiry, petitioner declined
to answer several questions. His reasons for doing so
were given in a statement he read to the Committee at

---

[5] "Whenever any official or board is given the power to summon
witnesses and take testimony, but has not the power to punish for
contempt, and any witness refuses to obey such summons, either
as to his appearance or as to the production of things specified in
the summons, or refuses to testify or to answer any question, a
petition for an order to compel him to testify or his compliance
with the summons may be filed in the superior court, or with some
justice thereof." N. H. Rev. Stat. Ann., 1955, c. 491, § 19. "Upon
such petition the court or justice shall have authority to proceed in
the matter as though the original proceeding had been in the court,
and may make orders and impose penalties accordingly." *Id.*, § 20.
See *State* v. *Uphaus*, 100 N. H. 1, 116 A. 2d 887.

the outset of the hearing.[6]   He declared he would not answer those questions which were not pertinent to the

---

[6] "Those called to testify before this and other similar investigations can be classified in three categories.

"First there are Communists and those who have reason to believe that even if they are not Communists they have been accused of being and are in danger of harassment and prosecution.

"Second, there are those who approve of the purposes and methods of these investigations.

"Third, there are those who are not Communists and do not believe they are in danger of being prosecuted, but who yet deeply disapprove of the purposes and methods of these investigations.

"The first group will naturally, and I think wholly justifiably, plead the constitutional privilege of not being witnesses against themselves.

"The second group will equally naturally be cooperative witnesses.

"The third group is faced with an extremely difficult dilemma.   I know because I belong to this third group, and I have been struggling with its problems for many weeks now.   I would like to explain what the nature of that dilemma is.   I think it is important that both those conducting these inquiries and the public should understand.

"It is often said: If a person is not a Communist and has nothing to fear, why should he not answer whatever questions are put to him and be done with it?   The answer, of course, is that some of us believe these investigations are evil and dangerous, and we do not want to give our approval to them, either tacitly or otherwise. On the contrary, we want to oppose them to the best of our ability and persuade others to do likewise, with the hope of eventually abolishing them altogether.

"Our reasons for opposing these investigations are not captious or trivial.   They have deep roots in principle and conscience.   Let me explain with reference to the present New Hampshire investigation.   The official purpose of the inquiry is to uncover and lay the basis for the prosecution of persons who in one way or another promote the forcible overthrow of constitutional forms of government.   Leaving aside the question of the constitutionality of the investigation, which is now before the courts, I think it must be plain to any reasonable person who is at all well informed about conditions in New Hampshire today that strict adherence to this purpose would leave little room for investigation.   It is obvious

subject under inquiry as well as those which transgress
the limitations of the First Amendment.   In keeping with

---

enough that there are few radicals or dissenters of any kind in New
Hampshire; and if there are any who advocate use of force and
violence, they must be isolated crackpots who are no danger to
anyone, least of all to the constitutional form of government of
state and nation.   The Attorney General should be able to check
these facts quickly and issue a report satisfying the mandate laid
upon him by the legislature.

"But this is not what he has done.  We do not know the whole
story, but enough has come out to show that the Attorney General
has issued a considerable number of subpoenas and has held hearings
in various parts of the state.  And so far as the available information
allows us to judge, most of those subpoenaed have fallen into one
or both of two groups: first professors at Dartmouth and the Uni-
versity of New Hampshire who have gained a reputation for liberal
or otherwise unorthodox views, and, second, people who have been
active in the Progressive Party.  It should be specially noted that
whatever may be thought of the Progressive Party in any other
respect, it was certainly not devoted to violent overthrow of consti-
tutional forms of government but on the contrary to effecting reforms
through the very democratic procedures which are the essence of
constitutional forms of government.

"The pattern I have described is no accident.  Whatever their
official purpose, these investigations always end up by inquiring
into the politics, ideas, and beliefs of people who hold what are,
for the time being, unpopular views.  The federal House Committee
on Un-American Activities, for example, is supposed to investigate
various kinds of propaganda and has no other mandate whatever.
Over the years, however, it has spent almost no time investigating
propaganda and has devoted almost all of its energies to 'exposing'
people and their ideas, their affiliations, their associations.  Similarly,
this New Hampshire investigation is supposed to be concerned with
violent overthrow of government, but it is actually turning out to be
concerned with what few manifestations of political dissent have
made themselves felt in the state in recent years.

"If all this is so, and if the very first principle of the American
constitutional form of government is political freedom—which I take
to include freedoms of speech, press, assembly, and association—then
I do not see how it can be denied that these investigations are a

this stand, he refused to disclose his knowledge of the Progressive Party in New Hampshire or of persons with

grave danger to all that Americans have always claimed to cherish. No rights are genuine if a person, for exercising them, can be hauled up before some tribunal and forced under penalties of perjury and contempt to account for his ideas and conduct.

"Let us now return to the problem of the witness who would have nothing to fear from being what is nowadays styled a 'friendly' witness, but who feels deeply that to follow such a course would be a betrayal of his principles and repugnant to his conscience. What other courses are open to him?

"He can claim the privilege not to be a witness against himself and thus avoid a hateful inquisition. I respect the decision of those who elect to take this course. My own reason for rejecting it is that, with public opinion in its present state, the exercise of the privilege is almost certain to be widely misinterpreted. One of the noblest and most precious guarantees of freedom, won in the course of bitter struggles and terrible suffering, has been distorted in our own day to mean a confession of guilt, the more sinister because undefined and indeed undefinable. It is unfortunate, but true, that the public at large has accepted this distortion and will scarcely listen to those who have invoked the privilege.

"Alternatively, the witness can seek to uphold his principles and maintain his integrity, not by claiming the protection of the Fifth Amendment (or the Fifteenth Article of the New Hampshire Bill of Rights), but by contesting the legitimacy of offensive questions on other constitutional and legal grounds.

"Just how far the First Amendment limits the right of legislative inquiry has not been settled. The Supreme Court of the United States is at this very moment considering a case (the *Emspak* case) which may do much to settle the question. But even before the Court has handed down its decision in the *Emspak* case, it is quite certain that the First Amendment does place *some* limitations on the power of investigation, and it is always open to a witness to challenge a question on the ground that it transgresses these limitations and, if necessary, to take the issue to the courts for decision.

"Moreover, a witness may not be required to answer questions unless they are 'pertinent to the matter under inquiry' (the words are those of the United States Supreme Court).

"What is the 'matter under inquiry' in the present investigation? According to the Act of the New Hampshire legislature directing

whom he was acquainted in that organization.[7]  No action was taken by the Attorney General to compel answers to these questions.

The Attorney General again summoned petitioner to testify on June 3, 1954.  There was more interrogation about the witness' prior contacts with Communists.  The Attorney General lays great stress upon an article which petitioner had co-authored.  It deplored the use of violence by the United States and other capitalist countries in attempting to preserve a social order which the writers thought must inevitably fall.  This resistance, the article

the investigation, its purpose is twofold: (1) 'to make full and complete investigation with respect to violations of the subversive activities act of 1951,' and (2) 'to determine whether subversive persons as defined in said act are presently located within this state.'

"I have studied the subversive activities act of 1951 with care, and I am glad to volunteer the information that I have absolutely no knowledge of any violations of any of its provisions; further, that I have no knowledge of subversive persons presently located within the state.

"That these statements may carry full conviction, I am prepared to answer certain questions about myself, though in doing so I do not mean to concede the right to ask them.  I am also prepared to discuss my views relating to the use of force and violence to overthrow constitutional forms of government.

"But I shall respectfully decline to answer questions concerning ideas, beliefs, and associations which could not possibly be pertinent to the matter here under inquiry and/or which seem to me to invade the freedoms guaranteed by the First Amendment to the United States Constitution (which, of course, applies equally to the several states)."

[7] The Progressive Party offered a slate of candidates for national office in the 1948 presidential election.  Henry A. Wallace, former Vice President of the United States, was the party's selection for the presidency.  Glen Taylor, former United States Senator, was the vice-presidential nominee of the party.  Nationwide, the party received a popular vote of 1,156,103.  Of this total, 1,970 votes for Progressive Party candidates were cast in New Hampshire.  Statistics of the Presidential and Congressional Election of November 2, 1948, ` pp. 24, 48–49.

continued, will be met by violence from the oncoming socialism, violence which is to be less condemned morally than that of capitalism since its purpose is to create a "truly human society." Petitioner affirmed that he styled himself a "classical Marxist" and a "socialist" and that the article expressed his continuing opinion.

Again, at the second hearing, the Attorney General asked, and petitioner refused to answer, questions concerning the Progressive Party, and its predecessor, the Progressive Citizens of America. Those were:

"Was she, Nancy Sweezy, your wife, active in the formation of the Progressive Citizens of America?"

"Was Nancy Sweezy then working with individuals who were then members of the Communist Party?"

"Was Charles Beebe active in forming the Progressive Citizens of America?"

"Was Charles Beebe active in the Progressive Party in New Hampshire?"

"Did he work with your present wife—Did Charles Beebe work with your present wife in 1947?"

"Did it [a meeting at the home of Abraham Walenko in Weare during 1948] have anything to do with the Progressive Party?"

The Attorney General also turned to a subject which had not yet occurred at the time of the first hearing. On March 22, 1954, petitioner had delivered a lecture to a class of 100 students in the humanities course at the University of New Hampshire. This talk was given at the invitation of the faculty teaching that course. Petitioner had addressed the class upon such invitations in the two preceding years as well. He declined to answer the following questions:

"What was the subject of your lecture?"

"Didn't you tell the class at the University of New Hampshire on Monday, March 22, 1954, that Socialism was inevitable in this country?"

244

"Did you advocate Marxism at that time?"

"Did you express the opinion, or did you make the statement at that time that Socialism was inevitable in America?"

"Did you in this last lecture on March 22 or in any of the former lectures espouse the theory of dialectical materialism?"

Distinct from the categories of questions about the Progressive Party and the lectures was one question about petitioner's opinions. He was asked: "Do you believe in Communism?" He had already testified that he had never been a member of the Communist Party, but he refused to answer this or any other question concerning opinion or belief.

Petitioner adhered in this second proceeding to the same reasons for not answering he had given in his statement at the first hearing. He maintained that the questions were not pertinent to the matter under inquiry and that they infringed upon an area protected under the First Amendment.

Following the hearings, the Attorney General petitioned the Superior Court of Merrimack County, New Hampshire, setting forth the circumstances of petitioner's appearance before the Committee and his refusal to answer certain questions.[8] The petition prayed that the court propound the questions to the witness. After hearing argument, the court ruled that the questions set out above were pertinent.[9] Petitioner was called as a witness by the court and persisted in his refusal to answer for constitutional reasons. The court adjudged him in contempt

[8] See note 5, *supra*.

[9] The court made a general ruling that questions concerning the opinions or beliefs of the witness were not pertinent. Nevertheless, it did propound to the witness the one question about his belief in Communism.

and ordered him committed to the county jail until purged of the contempt.

The New Hampshire Supreme Court affirmed. 100 N. H. 103, 121 A. 2d 783. Its opinion discusses only two classes of questions addressed to the witness: those dealing with the lectures and those about the Progressive Party and the Progressive Citizens of America. No mention is made of the single question concerning petitioner's belief in Communism. In view of what we hold to be the controlling issue of the case, however, it is unnecessary to resolve affirmatively that that particular question was or was not included in the decision by the State Supreme Court.

There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals. It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas, particularly in the academic community. Responsibility for the proper conduct of investigations rests, of course, upon the legislature itself. If that assembly chooses to authorize inquiries on its behalf by a legislatively created committee, that basic responsibility carries forward to include the duty of adequate supervision of the actions of the committee. This safeguard can be nullified when a committee is invested with a broad and ill-defined jurisdiction. The authorizing resolution thus becomes especially significant in that it reveals the amount of discretion that has been conferred upon the committee.

In this case, the investigation is governed by provisions in the New Hampshire Subversive Activities Act of

1951.[10]  The Attorney General was instructed by the
legislature to look into violations of that Act.  In addi-
tion, he was given the far more sweeping mandate to find
out if there were subversive persons, as defined in that
Act, present in New Hampshire.  That statute, there-
fore, measures the breadth and scope of the investigation
before us.

"Subversive persons" are defined in many gradations of
conduct.  Our interest is in the minimal requirements of
that definition since they will outline its reach.  Accord-
ing to the statute, a person is a "subversive person" if he,
by any means, aids in the commission of any act intended
to assist in the alteration of the constitutional form of
government by force or violence.[11]  The possible remote-
ness from armed insurrection of conduct that could sat-
isfy these criteria is obvious from the language.  The
statute goes well beyond those who are engaged in efforts
designed to alter the form of government by force or vio-
lence.  The statute declares, in effect, that the assistant
of an assistant is caught up in the definition.  This chain
of conduct attains increased significance in light of the
lack of a necessary element of guilty knowledge in either
stage of assistants.  The State Supreme Court has held
that the definition encompasses persons engaged in the
specified conduct ". . . whether or not done 'knowingly
and willfully . . . .' "  *Nelson* v. *Wyman,* 99 N. H. 33,

---

[10] See note 1, *supra.*

[11] " 'Subversive person' means any person who commits, attempts
to commit, or aids in the commission, or advocates, abets, advises or
teaches, by any means any person to commit, attempt to com-
mit, or aid in the commission of any act intended to overthrow,
destroy or alter, or to assist in the overthrow, destruction or altera-
tion of, the constitutional form of the government of the United
States, or of the state of New Hampshire, or any political subdivision
of either of them, by force, or violence; or who is a member of a
subversive organization or a foreign subversive organization." N. H.
Rev. Stat. Ann., 1955, c. 588, § 1.

39, 105 A. 2d 756, 763. The potential sweep of this definition extends to conduct which is only remotely related to actual subversion and which is done completely free of any conscious intent to be a part of such activity.

The statute's definition of "subversive organizations" is also broad. An association is said to be any group of persons, whether temporarily or permanently associated together, for joint action or advancement of views on any subject.[12] An organization is deemed subversive if it has a purpose to abet, advise or teach activities intended to assist in the alteration of the constitutional form of government by force or violence.

The situation before us is in many respects analogous to that in *Wieman* v. *Updegraff*, 344 U. S. 183. The Court held there that a loyalty oath prescribed by the State of Oklahoma for all its officers and employees violated the requirements of the Due Process Clause because it entailed sanctions for membership in subversive organizations without scienter. A State cannot, in attempting to bar disloyal individuals from its employ, exclude persons solely on the basis of organizational membership, regardless of their knowledge concerning the organizations to which they belonged. The Court said:

"There can be no dispute about the consequences visited upon a person excluded from public employ-

---

[12] "For the purpose of this chapter 'organization' means an organization, corporation, company, partnership, association, trust, foundation, fund, club, society, committee, political party, or any group of persons, whether or not incorporated, permanently or temporarily associated together for joint action or advancement of views on any subject or subjects.

" 'Subversive organization' means any organization which engages in or advocates, abets, advises, or teaches, or a purpose of which is to engage in or advocate, abet, advise, or teach activities intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States, or of the state of New Hampshire, or of any political subdivision of either of them, by force, or violence." *Ibid.*

ment on disloyalty grounds. In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy. Especially is this so in time of cold war and hot emotions when 'each man begins to eye his neighbor as a possible enemy.' Yet under the Oklahoma Act, the fact of association alone determines disloyalty and disqualification; it matters not whether association existed innocently or knowingly. To thus inhibit individual freedom of movement is to stifle the flow of democratic expression and controversy at one of its chief sources." 344 U. S., at 190–191.

The sanction emanating from legislative investigations is of a different kind than loss of employment. But the stain of the stamp of disloyalty is just as deep. The inhibiting effect in the flow of democratic expression and controversy upon those directly affected and those touched more subtly is equally grave. Yet here, as in *Wieman*, the program for the rooting out of subversion is drawn without regard to the presence or absence of guilty knowledge in those affected.

The nature of the investigation which the Attorney General was authorized to conduct is revealed by this case. He delved minutely into the past conduct of petitioner, thereby making his private life a matter of public record. The questioning indicates that the investigators had thoroughly prepared for the interview and were not acquiring new information as much as corroborating data already in their possession. On the great majority of questions, the witness was cooperative, even though he made clear his opinion that the interrogation was unjustified and unconstitutional. Two subjects arose upon which petitioner refused to answer: his lectures at the University of New Hampshire, and his knowledge of the Progressive Party and its adherents.

The state courts upheld the attempt to investigate the academic subject on the ground that it might indicate whether petitioner was a "subversive person." What he taught the class at a state university was found relevant to the character of the teacher. The State Supreme Court carefully excluded the possibility that the inquiry was sustainable because of the state interest in the state university. There was no warrant in the authorizing resolution for that. 100 N. H., at 110, 121 A. 2d, at 789–790. The sole basis for the inquiry was to scrutinize the teacher as a person, and the inquiry must stand or fall on that basis.

The interrogation on the subject of the Progressive Party was deemed to come within the Attorney General's mandate because that party might have been shown to be a "subversive organization." The State Supreme Court held that the ". . . questions called for answers concerning the membership or participation of named persons in the Progressive Party which, if given, would aid the Attorney General in determining whether that party and its predecessor are or were subversive organizations." 100 N. H., at 112, 121 A. 2d, at 791.

The New Hampshire court concluded that the ". . . right to lecture and the right to associate with others for a common purpose, be it political or otherwise, are individual liberties guaranteed to every citizen by the State and Federal Constitutions but are not absolute rights. . . . The inquiries authorized by the Legislature in connection with this investigation concerning the contents of the lecture and the membership, purposes and activities of the Progressive Party undoubtedly interfered with the defendant's free exercise of those liberties." 100 N. H., at 113, 121 A. 2d, at 791–792.

The State Supreme Court thus conceded without extended discussion that petitioner's right to lecture and his right to associate with others were constitutionally

protected freedoms which had been abridged through this investigation. These conclusions could not be seriously debated. Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters. These are rights which are safeguarded by the Bill of Rights and the Fourteenth Amendment. We believe that there unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread.

The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

Equally manifest as a fundamental principle of a democratic society is political freedom of the individual. Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political

ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society.

Notwithstanding the undeniable importance of freedom in the areas, the Supreme Court of New Hampshire did not consider that the abridgment of petitioner's rights under the Constitution vitiated the investigation. In the view of that court, "the answer lies in a determination of whether the object of the legislative investigation under consideration is such as to justify the restriction thereby imposed upon the defendant's liberties." 100 N. H., at 113–114, 121 A. 2d, at 791–792. It found such justification in the legislature's judgment, expressed by its authorizing resolution, that there exists a potential menace from those who would overthrow the government by force and violence. That court concluded that the need for the legislature to be informed on so elemental a subject as the self-preservation of government outweighed the deprivation of constitutional rights that occurred in the process.

We do not now conceive of any circumstance wherein a state interest would justify infringement of rights in these fields. But we do not need to reach such fundamental questions of state power to decide this case. The State Supreme Court itself recognized that there was a weakness in its conclusion that the menace of forcible overthrow of the government justified sacrificing constitutional rights. There was a missing link in the chain of reasoning. The syllogism was not complete. There was nothing to connect the questioning of petitioner with this fundamental interest of the State. Petitioner had been

interrogated by a one-man legislative committee, not by the legislature itself. The relationship of the committee to the full assembly is vital, therefore, as revealing the relationship of the questioning to the state interest.

In light of this, the state court emphasized a factor in the authorizing resolution which confined the inquiries which the Attorney General might undertake to the object of the investigation. That limitation was thought to stem from the authorizing resolution's condition precedent to the institution of any inquiry. The New Hampshire legislature specified that the Attorney General should act only when he had information which ". . . in his judgment may be reasonable or reliable." The state court construed this to mean that the Attorney General must have something like probable cause for conducting a particular investigation. It is not likely that this device would prove an adequate safeguard against unwarranted inquiries. The legislature has specified that the determination of the necessity for inquiry shall be left in the judgment of the investigator. In this case, the record does not reveal what reasonable or reliable information led the Attorney General to question petitioner. The state court relied upon the Attorney General's description of prior information that had come into his possession.[13]

---

[13] The State Supreme Court illustrated the "reasonable or reliable" information underlying the inquiries on the Progressive Party by quoting from a remark made by the Attorney General at the hearing in answer to petitioner's objection to a line of questions. The Attorney General had declared that he had ". . . considerable sworn testimony . . . to the effect that the Progressive Party in New Hampshire has been heavily infiltrated by members of the Communist Party and that the policies and purposes of the Progressive Party have been directly influenced by members of the Communist Party." 100 N. H., at 111, 121 A. 2d, at 790–791. None of this testimony is a part of the record in this case. Its existence and weight were not independently reviewed by the state courts.

The court did not point to anything that supported the question-

The respective roles of the legislature and the investigator thus revealed are of considerable significance to the issue before us. It is eminently clear that the basic discretion of determining the direction of the legislative inquiry has been turned over to the investigative agency. The Attorney General has been given such a sweeping and uncertain mandate that it is his decision which picks out the subjects that will be pursued, what witnesses will be summoned and what questions will be asked. In this circumstance, it cannot be stated authoritatively that the legislature asked the Attorney General to gather the kind of facts comprised in the subjects upon which petitioner was interrogated.

Instead of making known the nature of the data it desired, the legislature has insulated itself from those witnesses whose rights may be vitally affected by the investigation. Incorporating by reference provisions from its subversive activities act, it has told the Attorney General, in effect to screen the citizenry of New Hampshire to bring to light anyone who fits into the expansive definitions.

Within the very broad area thus committed to the discretion of the Attorney General there may be many facts

---

ing on the subject of the lecture. It stated that the Attorney General could inquire about lectures only if he ". . . possesses reasonable or reliable information indicating that the violent overthrow of existing government may have been advocated or taught, either 'knowingly and wilfully' or not." 100 N. H., at 110, 121 A. 2d, at 789–790. What, if anything, indicated that petitioner knowingly or innocently advocated or taught violent overthrow of existing government does not appear. At one point in the hearing, the Attorney General said to petitioner: "I have in the file here a statement from a person who attended your class, and I will read it in part because I don't want you to think I am just fishing. 'His talk this time was on the inevitability of the Socialist program. It was a glossed-over interpretation of the materialist dialectic.'" R. 107. The court did not cite this statement.

which the legislature might find useful. There would also be a great deal of data which that assembly would not want or need. In the classes of information that the legislature might deem it desirable to have, there will be some which it could not validly acquire because of the effect upon the constitutional rights of individual citizens. Separating the wheat from the chaff, from the standpoint of the legislature's object, is the legislature's responsibility because it alone can make that judgment. In this case, the New Hampshire legislature has delegated that task to the Attorney General.

As a result, neither we nor the state courts have any assurance that the questions petitioner refused to answer fall into a category of matters upon which the legislature wanted to be informed when it initiated this inquiry. The judiciary are thus placed in an untenable position. Lacking even the elementary fact that the legislature wants certain questions answered and recognizing that petitioner's constitutional rights are in jeopardy, we are asked to approve or disapprove his incarceration for contempt.

In our view, the answer is clear. No one would deny that the infringement of constitutional rights of individuals would violate the guarantee of due process where no state interest underlies the state action. Thus, if the Attorney General's interrogation of petitioner were in fact wholly unrelated to the object of the legislature in authorizing the inquiry, the Due Process Clause would preclude the endangering of constitutional liberties. We believe that an equivalent situation is presented in this case. The lack of any indications that the legislature wanted the information the Attorney General attempted to elicit from petitioner must be treated as the absence of authority. It follows that the use of the contempt power, notwithstanding the interference with constitutional rights,

was not in accordance with the due process requirements of the Fourteenth Amendment.

The conclusion that we have reached in this case is not grounded upon the doctrine of separation of powers. In the Federal Government, it is clear that the Constitution has conferred the powers of government upon three major branches: the Executive, the Legislative and the Judicial. No contention has been made by petitioner that the New Hampshire legislature, by this investigation, arrogated to itself executive or judicial powers. We accept the finding of the State Supreme Court that the employment of the Attorney General as the investigating committee does not alter the legislative nature of the proceedings. Moreover, this Court has held that the concept of separation of powers embodied in the United States Constitution is not mandatory in state governments. *Dreyer* v. *Illinois,* 187 U. S. 71; but cf. *Tenney* v. *Brandhove,* 341 U. S. 367, 378. Our conclusion does rest upon a separation of the power of a state legislature to conduct investigations from the responsibility to direct the use of that power insofar as that separation causes a deprivation of the constitutional rights of individuals and a denial of due process of law.

The judgment of the Supreme Court of New Hampshire is

*Reversed.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, concurring in the result.

For me this is a very different case from *Watkins* v. *United States, ante,* p. 178. This case comes to us solely through the limited power to review the action of the

States conferred upon the Court by the Fourteenth Amendment. Petitioner claims that respect for liberties guaranteed by the Due Process Clause of that Amendment precludes the State of New Hampshire from compelling him to answer certain questions put to him by the investigating arm of its legislature. Ours is the narrowly circumscribed but exceedingly difficult task of making the final judicial accommodation between the competing weighty claims that underlie all such questions of due process.

In assessing the claim of the State of New Hampshire to the information denied it by petitioner, we cannot concern ourselves with the fact that New Hampshire chose to make its Attorney General in effect a standing committee of its legislature for the purpose of investigating the extent of "subversive" activities within its bounds. The case must be judged as though the whole body of the legislature had demanded the information of petitioner. It would make the deepest inroads upon our federal system for this Court now to hold that it can determine the appropriate distribution of powers and their delegation within the forty-eight States. As the earlier Mr. Justice Harlan said for a unanimous Court in *Dreyer* v. *Illinois*, 187 U. S. 71, 84:

> "Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State. And its determination one way or the other cannot be an element in the inquiry whether the due process of law prescribed by the Fourteenth Amendment has been respected by the State or its representatives when dealing with matters involving life or liberty."

Whether the state legislature should operate largely by committees, as does the Congress, or whether committees should be the exception, as is true of the House of Commons, whether the legislature should have two chambers or only one, as in Nebraska, whether the State's chief executive should have the pardoning power, whether the State's judicial branch must provide trial by jury, are all matters beyond the reviewing powers of this Court. Similarly, whether the Attorney General of New Hampshire acted within the scope of the authority given him by the state legislature is a matter for the decision of the courts of that State, as it is for the federal courts to determine whether an agency to which Congress has delegated power has acted within the confines of its mandate. See *United States* v. *Rumely,* 345 U. S. 41. Sanction of the delegation rests with the New Hampshire Supreme Court, and its validation in *Nelson* v. *Wyman,* 99 N. H. 33, 105 A. 2d 756, is binding here.

Pursuant to an investigation of subversive activities authorized by a joint resolution of both houses of the New Hampshire Legislature, the State Attorney General subpoenaed petitioner before him on January 8, 1954, for extensive questioning. Among the matters about which petitioner was questioned were: details of his career and personal life, whether he was then or ever had been a member of the Communist Party, whether he had ever attended its meetings, whether he had ever attended meetings that he knew were also attended by Party members, whether he knew any Communists in or out of the State, whether he knew named persons with alleged connections with organizations either on the United States Attorney General's list or cited by the Un-American Activities Committee of the United States House of Representatives or had ever attended meetings with them, whether he had ever taught or supported the

258

overthrow of the State by force or violence or had ever known or assisted any persons or groups that had done so, whether he had ever been connected with organizations on the Attorney General's list, whether he had supported or written in behalf of a variety of allegedly subversive, named causes, conferences, periodicals, petitions, and attempts to raise funds for the legal defense of certain persons, whether he knew about the Progressive Party, what positions he had held in it, whether he had been a candidate for Presidential Elector for that Party, whether certain persons were in that Party, whether Communists had influenced or been members of the Progressive Party, whether he had sponsored activities in behalf of the candidacy of Henry A. Wallace, whether he advocated replacing the capitalist system with another economic system, whether his conception of socialism involved force and violence, whether by his writings and actions he had ever attempted to advance the Soviet Union's "propaganda line," whether he had ever attended meetings of the Liberal Club at the University of New Hampshire, whether the magazine of which he was co-editor was "a Communist-line publication," and whether he knew named persons.

Petitioner answered most of these questions, making it very plain that he had never been a Communist, never taught violent overthrow of the Government, never knowingly associated with Communists in the State, but was a socialist believer in peaceful change who had at one time belonged to certain organizations on the list of the United States Attorney General (which did not include the Progressive Party) or cited by the House Un-American Activities Committee. He declined to answer as irrelevant or violative of free speech guarantees certain questions about the Progressive Party and whether he knew particular persons. He stated repeatedly, however, that

he had no knowledge of Communists or of Communist influence in the Progressive Party, and he testified that he had been a candidate for that Party, signing the required loyalty oath, and that he did not know whether an alleged Communist leader was active in the Progressive Party.

Despite the exhaustive scope of this inquiry, the Attorney General again subpoenaed petitioner to testify on June 3, 1954, and the interrogation was similarly sweeping. Petitioner again answered virtually all questions, including those concerning the relationship of named persons to the Communist Party or other causes deemed subversive under state laws, alleged Communist influence on all organizations with which he had been connected including the Progressive Party, and his own participation in organizations other than the Progressive Party and its antecedent, the Progressive Citizens of America. He refused, however, to answer certain questions regarding (1) a lecture given by him at the University of New Hampshire, (2) activities of himself and others in the Progressive political organizations, and (3) "opinions and beliefs," invoking the constitutional guarantees of free speech.

The Attorney General then petitioned the Superior Court to order petitioner to answer questions in these categories. The court ruled that petitioner had to answer those questions pertaining to the lectures and to the Progressive Party and its predecessor but not those otherwise pertaining to "opinions and beliefs." Upon petitioner's refusal to answer the questions sanctioned by the court, he was found in contempt of court and ordered committed to the county jail until purged of contempt.

The Supreme Court of New Hampshire affirmed the order of the Superior Court. It held that the questions at issue were relevant and that no constitutional provision permitted petitioner to frustrate the State's demands. 100 N. H. 103, 121 A. 2d 783.

The questions that petitioner refused to answer regarding the university lecture, the third given by him in three years at the invitation of the faculty for humanities, were:

"What was the subject of your lecture?"

"Didn't you tell the class at the University of New Hampshire on Monday, March 22, 1954, that Socialism was inevitable in this country?"

"Did you advocate Marxism at that time?"

"Did you express the opinion, or did you make the statement at that time that Socialism was inevitable in America?"

"Did you in this last lecture on March 22 or in any of the former lectures espouse the theory of dialectical materialism?"

"I have in the file here a statement from a person who attended your class, and I will read it in part because I don't want you to think I am just fishing. 'His talk this time was on the inevitability of the Socialist program. It was a glossed-over interpretation of the materialist dialectic.' Now, again I ask you the original question."

In response to the first question of this series, petitioner had said at the hearing:

"I would like to say one thing in this connection, Mr. Wyman. I stated under oath at my last appearance that, and I now repeat it, that I do not advocate or in any way further the aim of overthrowing constitutional government by force and violence. I did not so advocate in the lecture I gave at the University of New Hampshire. In fact I have never at any time so advocated in a lecture anywhere. Aside from that I have nothing I want to say about the lecture in question."

The New Hampshire Supreme Court, although recognizing that such inquiries "undoubtedly interfered with

the defendant's free exercise" of his constitutionally guaranteed right to lecture, justified the interference on the ground that it would occur "in the limited area in which the legislative committee may reasonably believe that the overthrow of existing government by force and violence is being or has been taught, advocated or planned, an area in which the interest of the State justifies this intrusion upon civil liberties." 100 N. H., at 113, 114, 121 A. 2d, at 792. According to the court, the facts that made reasonable the Committee's belief that petitioner had taught violent overthrow in his lecture were that he was a Socialist with a record of affiliation with groups cited by the Attorney General of the United States or the House Un-American Activities Committee and that he was co-editor of an article stating that, although the authors hated violence, it was less to be deplored when used by the Soviet Union than by capitalist countries.

When weighed against the grave harm resulting from governmental intrusion into the intellectual life of a university, such justification for compelling a witness to discuss the contents of his lecture appears grossly inadequate. Particularly is this so where the witness has sworn that neither in the lecture nor at any other time did he ever advocate overthrowing the Government by force and violence.

Progress in the natural sciences is not remotely confined to findings made in the laboratory. Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society. The problems that are the respective preoccupations of anthropology, economics, law, psychology, sociology and related areas of scholarship are merely departmentalized dealing, by way of manageable division of analysis, with interpenetrating aspects of holistic per-

plexities. For society's good—if understanding be an essential need of society—inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling.

These pages need not be burdened with proof, based on the testimony of a cloud of impressive witnesses, of the dependence of a free society on free universities. This means the exclusion of governmental intervention in the intellectual life of a university. It matters little whether such intervention occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor. One need only refer to the address of T. H. Huxley at the opening of Johns Hopkins University, the Annual Reports of President A. Lawrence Lowell of Harvard, the Reports of the University Grants Committee in Great Britain, as illustrative items in a vast body of literature. Suffice it to quote the latest expression on this subject. It is also perhaps the most poignant because its plea on behalf of continuing the free spirit of the open universities of South Africa has gone unheeded.

> "In a university knowledge is its own end, not merely a means to an end. A university ceases to be true to its own nature if it becomes the tool of Church or State or any sectional interest. A university is characterized by the spirit of free inquiry, its ideal being the ideal of Socrates—'to follow the argument where it leads.' This implies the right to examine, question, modify or reject traditional ideas and beliefs. Dogma and hypothesis are incompatible, and the concept of an immutable doctrine is repug-

nant to the spirit of a university. The concern of its scholars is not merely to add and revise facts in relation to an accepted framework, but to be ever examining and modifying the framework itself.

. . . . .

"Freedom to reason and freedom for disputation on the basis of observation and experiment are the necessary conditions for the advancement of scientific knowledge. A sense of freedom is also necessary for creative work in the arts which, equally with scientific research, is the concern of the university.

. . . . .

". . . It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail 'the four essential freedoms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." The Open Universities in South Africa 10–12. (A statement of a conference of senior scholars from the University of Cape Town and the University of the Witwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities.[1])

I do not suggest that what New Hampshire has here sanctioned bears any resemblance to the policy against which this South African remonstrance was directed. I do say that in these matters of the spirit inroads on legitimacy must be resisted at their incipiency. This kind of evil grows by what it is allowed to feed on. The

---

[1] The Hon. A. v. d. S. Centlivres only recently retired as Chief Justice of South Africa, and the Hon. Richard Feetham is also an eminent, retired South African judge.

admonition of this Court in another context is applicable here. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." *Boyd* v. *United States,* 116 U. S. 616, 635.

Petitioner stated, in response to questions at the hearing, that he did not know of any Communist interest in, connection with, influence over, activity in, or manipulation of the Progressive Party. He refused to answer, despite court order, the following questions on the ground that, by inquiring into the activities of a lawful political organization, they infringed upon the inviolability of the right to privacy in his political thoughts, actions and associations:

> "Was she, Nancy Sweezy, your wife, active in the formation of the Progressive Citizens of America?"
>
> "Was Nancy Sweezy then working with individuals who were then members of the Communist Party?" [2]
>
> "Was Charles Beebe active in forming the Progressive Citizens of America?"
>
> "Did he work with your present wife—Did Charles Beebe work with your present wife in 1947?"
>
> "Did it [a meeting at the home of one Abraham Walenko] have anything to do with the Progressive Party?"

---

[2] Inclusion of this question among the unanswered questions appears to have been an oversight in view of the fact that petitioner attempted to answer it at the hearing by stating that he had never to his knowledge known members of the Communist Party in New Hampshire. In any event, petitioner's brief states that he is willing to repeat the answer to this question if the Attorney General so desires. This is consistent with his demonstrated willingness to answer all inquiries regarding the Communist Party, including its relation to the Progressive Party.

The Supreme Court of New Hampshire justified this intrusion upon his freedom on the same basis that it upheld questioning about the university lecture, namely, that the restriction was limited to situations where the Committee had reason to believe that violent overthrow of the Government was being advocated or planned. It ruled:

> ". . . That he [the Attorney General] did possess information which was sufficient to reasonably warrant inquiry concerning the Progressive Party is evident from his statement made during the hearings held before him that 'considerable sworn testimony has been given in this investigation to the effect that the Progressive Party in New Hampshire has been heavily infiltrated by members of the Communist Party and that the policies and purposes of the Progressive Party have been directly influenced by members of the Communist Party.' " 100 N. H., at 111, 121 A. 2d, at 790.

For a citizen to be made to forego even a part of so basic a liberty as his political autonomy, the subordinating interest of the State must be compelling. Inquiry pursued in safeguarding a State's security against threatened force and violence cannot be shut off by mere disclaimer, though of course a relevant claim may be made to the privilege against self-incrimination. (The New Hampshire Constitution guarantees this privilege.) But the inviolability of privacy belonging to a citizen's political loyalties has so overwhelming an importance to the well-being of our kind of society that it cannot be constitutionally encroached upon on the basis of so meagre a countervailing interest of the State as may be argumentatively found in the remote, shadowy threat to the security of New Hampshire allegedly presented in the origins and contributing elements of the Progressive Party and in petitioner's relations to these.

In the political realm, as in the academic, thought and action are presumptively immune from inquisition by political authority. It cannot require argument that inquiry would be barred to ascertain whether a citizen had voted for one or the other of the two major parties either in a state or national election. Until recently, no difference would have been entertained in regard to inquiries about a voter's affiliations with one of the various so-called third parties that have had their day, or longer, in our political history. This is so, even though adequate protection of secrecy by way of the Australian ballot did not come into use till 1888. The implications of the United States Constitution for national elections and "the concept of ordered liberty" implicit in the Due Process Clause of the Fourteenth Amendment as against the States, *Palko* v. *Connecticut*, 302 U. S. 319, 325, were not frozen as of 1789 or 1868, respectively. While the language of the Constitution does not change, the changing circumstances of a progressive society for which it was designed yield new and fuller import to its meaning. See *Hurtado* v. *California*, 110 U. S. 516, 528–529; *McCulloch* v. *Maryland*, 4 Wheat. 316. Whatever, on the basis of massive proof and in the light of history, of which this Court may well take judicial notice, be the justification for not regarding the Communist Party as a conventional political party, no such justification has been afforded in regard to the Progressive Party. A foundation in fact and reason would have to be established far weightier than the intimations that appear in the record to warrant such a view of the Progressive Party.[3] This precludes the questioning that petitioner resisted in regard to that Party.

To be sure, this is a conclusion based on a judicial judgment in balancing two contending principles—the right

---

[3] The Progressive Party was on the ballot in forty-four States, including New Hampshire, in 1948, and in twenty-six States in 1952.

of a citizen to political privacy, as protected by the Fourteenth Amendment, and the right of the State to self-protection. And striking the balance implies the exercise of judgment. This is the inescapable judicial task in giving substantive content, legally enforced, to the Due Process Clause, and it is a task ultimately committed to this Court. It must not be an exercise of whim or will. It must be an overriding judgment founded on something much deeper and more justifiable than personal preference. As far as it lies within human limitations, it must be an impersonal judgment. It must rest on fundamental presuppositions rooted in history to which widespread acceptance may fairly be attributed. Such a judgment must be arrived at in a spirit of humility when it counters the judgment of the State's highest court. But, in the end, judgment cannot be escaped—the judgment of this Court. See concurring opinions in *Haley* v. *Ohio,* 332 U. S. 596, 601; *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 466, 470–471; *Malinski* v. *New York,* 324 U. S. 401, 412, 414–417.

And so I am compelled to conclude that the judgment of the New Hampshire court must be reversed.

Mr. Justice Clark, with whom Mr. Justice Burton joins, dissenting.

The Court today has denied the State of New Hampshire the right to investigate the extent of "subversive activities" within its boundaries in the manner chosen by its legislature. Unfortunately there is no opinion for the Court, for those who reverse are divided and they do so on entirely different grounds. Four of my Brothers join in what I shall call the principal opinion. They hold that the appointment of the Attorney General to act as a committee for the legislature results in a separation of its power to investigate from its "responsibility to direct the use of that power" and thereby "causes a deprivation

of the constitutional rights of individuals and a denial of due process . . . ." This theory was not raised by the parties and is, indeed, a novel one.

My Brothers FRANKFURTER and HARLAN do not agree with this opinion because they conclude, as do I, that the internal affairs of the New Hampshire State Government are of no concern to us. See *Dreyer* v. *Illinois,* 187 U. S. 71, 84 (1902). They do join in the reversal, however, on the ground that Sweezy's rights under the First Amendment have been violated. I agree with neither opinion.

The principal opinion finds that "The Attorney General has been given such a sweeping and uncertain mandate that it is his decision which picks out the subjects that will be pursued, what witnesses will be summoned and what questions will be asked." The New Hampshire Act clearly indicates that it was the legislature that determined the general subject matter of the investigation, subversive activities; the legislature's committee, the Attorney General, properly decided what witnesses should be called and what questions should be asked. My Brothers surely would not have the legislature as a whole make these decisions. But they conclude, nevertheless, that it cannot be said that the legislature "asked the Attorney General to gather the kind of facts comprised in the subjects upon which petitioner was interrogated." It follows, says this opinion, that there is no "assurance that the questions petitioner refused to answer fall into a category of matters upon which the legislature wanted to be informed . . . ." But New Hampshire's Supreme Court has construed the state statute. It has declared the purpose to be to investigate "subversive" activities within the State; it has approved the use of the "one-man" technique; it has said the questions were all relevant to the legislative purpose. In effect the state court says the Attorney General was "directed" to inquire as he did.

Furthermore, the legislature renewed the Act in the same language twice in the year following Sweezy's interrogation. N. H. Laws 1955, c. 197. In ratifying the Attorney General's action it used these words: "The investigation . . . provided for by chapter 307 of the Laws of 1953, as continued by a resolution approved January 13, 1955, is hereby continued in full force and effect, in form, *manner* and authority as therein provided . . . ." (Emphasis added.) We are bound by the state court findings. We have no right to strike down the state action unless we find not only that there has been a deprivation of Sweezy's constitutional rights, but that the interest in protecting those rights is greater than the State's interest in uncovering subversive activities within its confines. The majority has made no such findings.

The short of it is that the Court blocks New Hampshire's effort to enforce its law. I had thought that in *Pennsylvania* v. *Nelson,* 350 U. S. 497 (1956), we had left open for legitimate state control any subversive activity leveled against the interest of the State. I for one intended to suspend state action only in the field of subversion against the Nation and thus avoid a race to the courthouse door between federal and state prosecutors. Cases concerning subversive activities against the National Government have such interstate ramifications that individual state action might effectively destroy a prosecution on the national level. I thought we had left open a wide field for state action, but implicit in the opinions today is a contrary conclusion. They destroy the fact-finding power of the State in this field and I dissent from this wide sweep of their coverage.

The principal opinion discusses, by way of dictum, due process under the Fourteenth Amendment. Since the basis of the opinion is not placed on this ground, I would not think it necessary to raise it here. However, my Brothers say that the definition of "subversive person"

lacks "a necessary element of guilty knowledge . . . ." *Wieman* v. *Updegraff,* 344 U. S. 183 (1952), is heavily depended upon as authority for the view expressed. I do not so regard it. I authored that opinion. It was a loyalty oath case in which Oklahoma had declared *ipso facto* disqualified any employee of the State who failed to take a prescribed oath that, *inter alia,* he belonged to no subversive organizations. We struck down the Act for lack of a requirement of *scienter.* We said there that "constitutional protection . . . extend[s] to the public servant whose *exclusion pursuant to a statute* is patently arbitrary or discriminatory." *Id.,* at 192. But Sweezy is not charged as a "subversive person" and the Committee has made no finding that he is. In fact, had he been found to be such a person, there is no sanction under the Act. New Hampshire is invoking no statute like Oklahoma's. Its Act excludes no one from anything. *Updegraff* stands for no such broad abstraction as the principal opinion suggests.

Since the conclusion of a majority of those reversing is not predicated on the First Amendment questions presented, I see no necessity for discussing them. But since the principal opinion devotes itself largely to these issues I believe it fair to ask why they have been given such an elaborate treatment when the case is decided on an entirely different ground. It is of no avail to quarrel with a straw man. My view on First Amendment problems in this type of case is expressed in my dissent in *Watkins,* decided today, *ante,* p. 217. Since a majority of the Court has not passed on these problems here, and since I am not convinced that the State's interest in investigating subversive activities for the protection of its citizens is outweighed by any necessity for the protection of Sweezy I would affirm the judgment of the New Hampshire Supreme Court.