Chief Judge Fuld (concurring).
I agree with the court’s conclusion that the subpoena may not be quashed and that the order should, therefore, be affirmed. The District Attorney unquestionably has the power to subpoena the petitioners and to ask them whether they have engaged in criminal conduct or whether they have competent information concerning such conduct by others. Upon attending in response to the subpoena, the petitioners may, if they wish, assert their privilege against self incrimination under both the State and Federal Constitutions. However, I am constrained to add to what has been written because, it seems to me, statements in the opinion, touching on the petitioners ’ right to freedom of expression, carry with them implications which, though not necessary to decision, should be dispelled.
*143 The scope of the Grand Jury inquiry to be conducted is — as both the District Attorney and the County Court below intimated— actually broader than that suggested by the three questions set forth in the opening paragraph of the court’s opinion. One branch of that inquiry is aimed at suspected criminal conduct, including—to quote from the County Court’s opinion — “ official misconduct, obstructing governmental administration, hindering prosecution and the various dangerous drug offenses.” Insofar as the investigation is directed either at criminal conduct not consisting of speech or at speech which, by statute and within constitutional limits, is defined as criminal,1 we have before us only the Fifth Amendment question already discussed. On this aspect of the case, as I have indicated, I concur in Judge Burke’s opinion. The other branch of the inquiry—which 'raises questions of serious and far-reaching import affecting the publicly operated colleges and universities of this State—is proposed to be undertaken under subdivision 1 of section 253-a of the Code of Criminal Procedure which was enacted in 1964 (L. 1964, ch. 350). That subdivision provides .that the Grand Jury may submit to the court a report ‘ ‘ concerning non-criminal misconduct, nonfeasance or neglect in office by a public officer or employee as the basis for a recommendation of removal or disciplinary action (Emphasis supplied.) And the District Attorney states that the Grand Jury plans, on the strength of that provision, to go beyond questions of possibly criminal behavior and to inquire into the concededly noncriminal ‘ ‘ misconduct ’ ’ of the publicly employed college teachers who are the petitioners herein.
It is difficult to imagine —• and the District Attorney does not suggest — the sort of wowcriminal conduct of a teacher which might be deemed to be “ mis conduct,” unless it be a kind of teaching or writing that a Grand Jury might regard either as “ wrong ” or insufficient or ineffective. Thus, we deal here with sensitive problems of free expression — accentuated because *144 they arise in an academic setting — and it is, therefore, appropriate to speak to the issue at this stage of the case, as the court itself does, and not to wait until, by an improperly extended inquiry, the damage to protected freedoms is already done. (See, infra, pp. 145-146.)
Whether the Grand Jury, in its search for nóncriminal ‘ ‘ misconduct ’ ’ on the part of university teachers and administrators, were to look toward 'the content or the quality of what was said upon the campus —• or even toward what may have been left unsaid —■ it would, in my opinion, exceed its lawful powers. The Legislature may not be thought to have intended, by section 253-a of the code, to have entrusted questions of this sort to local Grand Juries and District Attorneys. Such a construction of section 253-a would vastly distort and encroach upon the carefully designed scheme for the administration of public colleges and universities provided by the Education Law—manifestly, a more likely place in which to find the legislative purposes on these subjects than the Code of Criminal Procedure.
The framework of the Education’Law reflects the Legislature’s long-standing awareness of the unique character and importance of education and of the need for adapting the governance of State colleges and universities to their special function of encouraging scholarship and the free interchange of ideas. Supervisory authority is thus vested in the Regents (§ 207) and in the State University Trustees (§§ 350-355-a). In addition, and subject to these higher authorities, each state-operated institution of the State University is “ supervised locally ” by a council of nine members appointed by the Governor (§ 356). And each institution, of course, has its own full-time administrative officers. We may not assume that the Legislature meant this well-conceived administrative plan to be subject to the occasional and haphazard intrusion of Grand Juries (insofar as noncriminal behavior is concerned) in whatever locality the institution happened to be placed. The methods and legal weapons of Grand Juries, designed for the enforcement of the criminal law, are totally unsuited for and out of place in the direction of colleges and universities, whether they be public or private.
Moreover, and this is of high importance, we run into a serious constitutional question if we read section 253-a as authoriz *145 ing Grand Jury interrogation of teachers in order to enable that body to report on whether their noncriminal speech or behavior may be branded as misconduct.
Speech may, of course, be effectively stifled by measures which fall far short of indictment and conviction for crime, and, when such measures are resorted to by the State, they violate the guarantees of the First and Fourteenth Amendments. (See Freedman v. Maryland, 380 U. S. 51, 60; Dombrowski v. Pfister, 380 U. S. 479, 487.) Thus, in the Dombrowski case, the Supreme Court (per BRENNAN, J.) noted (380 U. S., at p. 487) that it has “ avoided making vindication of freedom of expression await the outcome of protracted litigation ” (386 U. S., at p. 487). And, the court added, “ the improbability of successful prosecution [does not make] the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of prosecution, unaffected by the prospects of its success or failure.” (Emphasis supplied.) Moreover, in Freedman (380 U. S. 51, supra), the court held that a too cumbersome and time-consuming procedure for judicial review, in motion picture censorship cases, was enough to produce an unconstitutionally ‘1 chilling effect ’ ’ on free expression.
We would have to be blind to reality not to recognize that a subpoena commanding a teacher to appear before the Grand Jury—a body not given, ordinarily, to academic discussion — to testify, against his will, concerning his talks with students or his lectures in class is suppressive and intimidating in effect, even though the questions may not be designed to expose him as a criminal but merely as the holder of unpopular views. How better to inhibit open discussion, the vital quickening current of education itself, than by such means? A Grand Jury subpoena carries with it, and particularly in contexts such as the present one, the implication of danger and the unmistakable suggestion of disapproval by agencies charged with enforcing the criminal law. “ Scholarship cannot flourish in an atmosphere of suspicion and distrust.” (Sweezy v. New Hampshire, 354 U. S. 234, 250.) Were District Attorneys to take encouragement, from the court’s opinion, to summon before Grand Juries teachers whose utterances were unorthodox, though not criminal, we might well have a shadow cast over our classrooms and universities of the very kind the First Amendment was designed to *146 avert, the shadow of the censor, the policeman and the inquisitor. “ Our Nation ”, the Supreme Court declared in Keyishian v. Board of Regents (385 U. S. 589, 603, supra), “ is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.”
It serves no proper purpose of District Attorney or Grand Jury — insofar as .they are not investigating criminal conduct —■ to ask a teacher what he is teaching. Considering the scope of our constitutional guarantees, I can think of few instances, indeed, in which a teacher’s statements to his class might he relevant to the commission of a crime. Only in such cases should a teacher be compelled to submit to questioning before a Grand Jury on what has passed between himself and his students.
In holding that the subpoena may not be quashed, we should not, therefore, appear to sanction an investigation into the wow-criminal speech and conduct of the petitioners before us. We should make clear, as I have sought to do, the limits placed, by both Constitution and statute, upon the Grand Jury’s power to pursue such inquiries.
Judges Bergan, Keating and Breitel concur with Judge Burke; Chief Judge Fuld concurs in a separate opinion; Judges Scileppi and Jasen concur in result only.
Order affirmed.