REBECCA GRASSL BRADLEY, J. (concurring).
¶ 97 In this unprecedented dispute between a university and a professor, academic freedom was put on trial. Would the sacred "right of faculty members to speak as citizens-that is, 'to address the larger community with regard to any matter of social, political, economic or other interest without institutional discipline or restraint' "[1] -succumb to the dominant academic culture of micro-aggressions, trigger warnings and safe spaces[2] that seeks to *745 silence unpopular speech by deceptively recasting it as violence? In this battle, only one could prevail, for academic freedom cannot coexist with Orwellian speech police. Academic freedom means nothing if faculty is forced to self-censor in fear of offending the unforeseen and ever-evolving sensitivities of adversaries demanding retribution.
¶ 98 "[T]he peculiar evil of silencing the expression of an opinion is ... robbing the human race; posterity as well as the existing generation; those who dissent from the opinion, still more than those who hold it. If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose, what is almost as great a benefit, the clearer perception and livelier impression of truth, produced by its collision with error."[3] Many American universities were founded "on the illimitable freedom of the human mind" to develop, articulate, examine and communicate ideas in order to "follow truth wherever it may lead."[4] Marquette University's own mission includes "the search for truth, the discovery and sharing of knowledge."[5] When academic freedom was under attack for being "dangerous" and "oppressive" forty years ago, one of America's oldest universities reaffirmed that "[t]he history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable."[6] Over time, academia has begun to abandon this Jeffersonian creed,[7] replacing it with groupthink tribalism seeking to silence disfavored viewpoints.[8]
¶ 99 I join the majority in full. The opinion ably addresses academic freedom in a manner narrowly tailored to this case, which was easily resolved by applying the language of Marquette's contract with McAdams to the undisputed facts. The court correctly concludes that the contract guarantees McAdams academic freedom, academic freedom encompasses his blog post, and Marquette's suspension of McAdams breached the contract.
¶ 100 I write separately because academic freedom, and concomitantly, free speech, is increasingly imperiled in America and within the microcosm of the college *746 campus. A broader discussion of the significance and meaning of academic freedom will benefit universities who contractually extend academic freedom to professors, as Marquette did, as well as courts across the nation tackling these issues.
I
¶ 101 The United States Supreme Court has discussed the importance of academic freedom in a variety of cases, but has not definitively expounded its meaning. In Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Court described academic freedom as being "of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." See also Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."); Barenblatt v. United States, 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) (describing "academic teaching-freedom and its corollary learning-freedom" as "so essential to the well-being of the Nation"); Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality) ("The essentiality of freedom in the community of American universities is almost self-evident.... Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.").
¶ 102 Specific definitions can be found in other authoritative sources. Black's Law Dictionary defines academic freedom as "the right (esp. of a university teacher) to speak freely about political or ideological issues without fear of loss of position or other reprisal."[9] The American Association of University Professors (AAUP) defines academic freedom as the liberty to "speak or write as citizens ... free from institutional censorship or discipline."[10] Russell Kirk described academic freedom as a principle that teachers and scholars should be "protect[ed] ... from hazards that tend to prevent [them] from meeting [their] obligations in the pursuit of truth."[11]
¶ 103 The roots of academic freedom are ancient. Dr. Martin Luther King Jr. attributed the concept's origin to Socrates. See Martin Luther King, Jr., Letter from Birmingham Jail (Apr. 16, 1963), in The Autobiography of Martin Luther King, Jr. 187, 194 (Clayborne Carson ed., 1998). The *747 search for truth to which the founder of the first academy, Plato, was dedicated, has been identified as the progenitor of academic freedom. Larry D. Spurgeon, A Transcendent Value: The Quest to Safeguard AcademicFreedom, 34 J.C. & U.L 111, 117 (2007). The modern understanding of academic freedom likely originated in German principles of Lehrfreiheit and Lernfreiheit, the freedom to teach and the freedom to learn, respectively. Julie H. Margetta, Taking Academic Freedom Back to the Future: Refining the "Special Concern of the First Amendment", 7 Loy. J. Pub. Int. L. 1, 5 (2005). The German conception of academic freedom encompassed students, perhaps a recognition that inhibiting the freedom of teachers impedes learning.
¶ 104 The concept appears in American history as early as the eighteenth century in Thomas Jefferson's founding vision of the University of Virginia: "This institution will be based on the illimitable freedom of the human mind. For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left to combat it."[12] Nineteenth century academics did not confine their exercise of academic freedom to the classroom, but understood the principle to protect their "right to express their opinions even outside the walls of academia, even on controversial subjects." Geoffrey R. Stone, A Brief History of Academic Freedom, in Who's Afraid of Academic Freedom? 5 (Akeel Bilgrami & Jonathan R. Cole eds., 2015). Protection of extramural speech-expression beyond the boundaries of the university-endures: "Freedom of extramural utterances is a constitutive part of the American conception of academic freedom."[13]
¶ 105 Academic freedom encompasses "two distinct concepts": (1) "professional academic freedom" tied to AAUP standards, and (2) the "legal concept of academic freedoms" tied to the First Amendment. Margetta, supra ¶ 7, at 4-5. Academic freedom has also been expressed as a right under the First Amendment, which in public universities serves as the source for academic freedom. See generally Donald A. Downs, Academic Freedom: What It Is, What It Isn't, and How to Tell the Difference, Pope Ctr. Series on Higher Educ., May 2009, at 1. The AAUP specifically accords extramural statements protections that are coextensive with the First Amendment, noting that a university questioning a professor's fitness should "remove from consideration any supposed rhetorical transgressions that would not be found to exceed the protections of the First Amendment."[14] Academic freedom and free speech are interconnected concepts and frequent companions. I discuss these doctrines synchronously because Marquette guaranteed McAdams both rights and contractually shielded him from discipline for his exercise of either.
II
¶ 106 The United States Supreme Court has repeatedly recognized the importance of academic freedom and freedom of expression on America's college campuses, without which "our civilization will stagnate *748 and die." Sweezy, 354 U.S. at 250, 77 S.Ct. 1203. In 1957, the Court noted the "essentiality of freedom in the community of American universities" as "almost self-evident," concluding that "[s]cholarship cannot flourish" unless "[t]eachers and students ... always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." Id.
¶ 107 A decade later, the Court affirmed: "Our Nation is deeply committed to safeguarding academic freedom" which is "a special concern of the First Amendment." Keyishian, 385 U.S. at 603, 87 S.Ct. 675 (1967). The role "played by those who guide and train our youth" in America's universities cannot be understated. Id. (quoting Sweezy, 354 U.S. at 250, 77 S.Ct. 1203 ). Public discourse on controversial topics is essential to our success as a nation. Id."To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." Id. (emphasis added).
¶ 108 In 1972, the Court stressed that the "college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.' " Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). The Court "reaffirm[ed] this Nation's dedication to safeguarding academic freedom." Id. at 180-81, 92 S.Ct. 2338. And, in 2003, it emphasized that "universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003).
¶ 109 This collection of cases establishes the centrality of academic freedom on college campuses, and the judicial branch's responsibility to vigilantly protect it. Several federal appellate courts have acknowledged the right of university professors "to disseminate publicly [their] views as ... teacher[s] or scholar[s]." Omosegbon v. Wells, 335 F.3d 668, 677 (7th Cir. 2003). Protecting academic freedom is particularly pressing when the views expressed "fall outside the mainstream." Rodriguez v. Maricopa Cty. Cmty. Coll. Dist., 605 F.3d 703, 708 (9th Cir. 2010). "Without the right to stand against society's most strongly-held convictions, the marketplace of ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched." Id.
¶ 110 For example, a federal district court denied the University of Illinois' motion to dismiss a newly hired professor's breach of contract action against the University for rescinding the contract based on the professor's profanity-laden diatribe against Israel, which he posted on Twitter. Salaita v. Kennedy, 118 F.Supp.3d 1068, 1075-84 (N.D. Ill. 2015) (classifying professor's personal tweets as a matter of public concern and determining Salaita's complaint sufficiently alleged a First Amendment claim); see also Starsky v. Williams, 353 F.Supp. 900, 922-24, 927 (D. Ariz. 1972), aff'd in part, rev'd in part, 512 F.2d 109 (9th Cir. 1975) (firing professor for participating in a protest and making profane remarks critical of administration violated AAUP standards that prohibit such discipline as well as a First Amendment right to express unpopular views); Adamian v. Jacobsen, 523 F.2d 929, 931, 934 (9th Cir. 1975) (professor who made profane comments, disrupted campus ceremonies, and incited potential violent confrontation during Vietnam and Kent State protest cannot be disciplined for such political agitation; remanded for further proceedings).
¶ 111 It is the expression of opinions divergent from what is currently politically correct that needs protection under the doctrine of academic freedom. "If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free *749 thought-not free thought for those who agree with us but freedom for the thought that we hate." United States v. Schwimmer, 279 U.S. 644, 655, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (Holmes, J., dissenting). If academic freedom does not protect dissident viewpoints, the doctrine is worthless. After all, "[i]ntellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." Rodriguez, 605 F.3d at 708.
¶ 112 Academic freedom, however, is not limitless. Like Marquette, many universities have adopted the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. With rights come responsibilities and the AAUP guides the exercise of academic freedom in its Statement on Professional Ethics.[15] For example, this ethics code for professors demands the practice of "intellectual honesty," the protection of students' academic freedom, and the avoidance of creating any impression of speaking on behalf of the university.
¶ 113 Courts have also circumscribed some limits around academic freedom. It does not impede a "university's ability to control its curriculum," Edwards v. Cal. Univ. of Pa., 156 F.3d 488, 491 (3d Cir. 1998), or "to regulate the content of what is or is not expressed" when it is the university that is speaking, Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833-34, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).[16] But, the doctrine does preclude universities from punishing academic speakers who publicly discuss matters of public concern beyond the classroom. See Vikram Amar & Alan Brownstein, Academic Freedom, 9 Green Bag 2d 17, 25-26 (2005). Just as no citizen could "be punished for writing a book that angers the state legislature-no matter how outrageous or offensive the book might be," id., professors at universities should not be punished for speaking on matters of public concern even if-especially if-that speech does not conform with mainstream thought.[17]
III
¶ 114 Courts have been "particularly vigilant" when there is an "alleged assault" on the First Amendment involving academic freedom. Larry D. Spurgeon, A Transcendent Value: The Quest to Safeguard Academic Freedom, 34 J.C. & U.L 111, 150 (2007) ("A 'special concern' means that courts should be particularly vigilant when an alleged assault on the First Amendment involves academic speech."). The First Amendment protects speech of university employees when it involves "matters of public concern"-speech that can be "fairly considered as relating to" issues "of political, social, or other concern to the community."[18]
*750 Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ; see also Pickering v. Bd. of Educ., 391 U.S. 563, 572-73, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[19]
¶ 115 The Court struck down a West Virginia law compelling all teachers and students to salute the American Flag while pledging allegiance to it and those who refused were expelled from school. W. Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 626-30, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The Court, declaring the law violative of the First Amendment, proclaimed: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id. at 642, 63 S.Ct. 1178.
¶ 116 In Keyishian, the Court nullified New York laws requiring university professors to certify they were not communists. 385 U.S. at 603-04, 87 S.Ct. 675. Concerned about both academic freedom and the First Amendment, the Court identified the "chilling effect upon the exercise of vital First Amendment rights" when vague and general restrictions cause a teacher to "guess what conduct or utterance may lose him his position." Id. at 604, 87 S.Ct. 675.
¶ 117 Similarly, the Court held unconstitutional an Oklahoma law requiring teachers to take a "loyalty oath" disclaiming affiliation "directly or indirectly" with any organization or group determined "to be a communist front or subversive organization." Wieman v. Updegraff, 344 U.S. 183, 186, 73 S.Ct. 215, 97 L.Ed. 216 (1952). The Court held the law infringed individual constitutional rights, was an "assertion of arbitrary power," and offended due process. Id. at 188-91, 73 S.Ct. 215. It recognized that "inhibiting individual freedom of movement" when a teacher may have innocently joined a group would "stifle the flow of democratic expression and controversy at one of its chief sources." Id. at 191, 73 S.Ct. 215.
¶ 118 Sweezy involved a professor who was convicted for refusing to answer political association questions. 354 U.S. at 238-45, 77 S.Ct. 1203. The Court reversed the conviction, emphasizing academic freedom and freedom of expression. Id. at 249-50, 77 S.Ct. 1203. Recognizing freedom of expression as a "fundamental principle of democratic society," the Court professed the significance of divergent voices: "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." Id. at 251, 77 S.Ct. 1203.
¶ 119 Finally, in Shelton, the Court struck down an Arkansas statute requiring teachers to annually file an affidavit listing "every organization to which [they have] belonged or regularly contributed within *751 the preceding five years." 364 U.S. at 480, 81 S.Ct. 247. The Court held this law abridged teachers' constitutional rights by inhibiting free speech, assembly, and association. Id. at 485-89, 81 S.Ct. 247. "Such unwarranted inhibition upon the free spirit of teachers ... has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice...." Id. at 487, 81 S.Ct. 247 (quoting Wieman, 344 U.S. at 195, 73 S.Ct. 215 (Frankfurter, J., concurring) ).
IV
¶ 120 In every case presenting the Supreme Court with the issue, it unfailingly declared the importance of academic freedom and freedom of expression in academia. It struck down many laws that undoubtedly had the support of a majority of the people. In the midst of the fear and tension gridlocking American international politics during the Cold War, few would publicly object to ensuring that teachers-entrusted with educating the future leaders of America-would denounce Communism and would not influence students to become Communists. Despite the good intentions underpinning such laws, the Court repeatedly struck them down and continually emphasized the importance of academic freedom, the need for free expression on college campuses, and the significant value that opposing viewpoints play in the advancement of ideas. From Aristotle challenging the then-predominant belief that the Earth was flat to Susan B. Anthony and Elizabeth Cady Stanton asserting the then-preposterous idea that women should vote, the past is replete with examples of unpopular ideas proven right when freely aired and debated. To squelch discussion of any idea jeopardizes our future.
¶ 121 Academic freedom exists to further the search for truth through vigorous open inquiry, discourse, and debate. See, e.g., Healy, 408 U.S. at 180, 92 S.Ct. 2338. Permitting debate ensures "the security of the Republic, the very foundation of constitutional government." De Jonge v. State of Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937) ("to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means"). And, as Pickering instructs, criticisms of campus administration are part of the public debate. 391 U.S. at 573-74, 88 S.Ct. 1731.
¶ 122 This court acknowledged the importance of academic freedom, specifically the freedom to criticize university administration, almost sixty years ago when it decided State ex rel. Ball v. McPhee, 6 Wis. 2d 190, 94 N.W.2d 711 (1959), overruled in part on other grounds, Stacy v. Ashland Cty. Dep't. of Public Welfare, 39 Wis. 2d 595, 159 N.W.2d 630 (1968). In that case, this court recognized that a university should not be able to discharge a professor on the basis of the professor's expression of philosophical disagreements with administration: "Surely a teacher in a state college is entitled to some academic freedom in criticizing school programs with which he is in disagreement. Such acts of criticism do not qualify as either inefficiency or bad behavior." Id. at 204, 94 N.W.2d 711.
V
¶ 123 Professional academic freedom is often regarded to be "alive and well"[20] as the dearth of court cases may corroborate. News reports of intra-campus clashes between *752 professors and administrators[21] suggest otherwise, although many disputes never reach the courts for obvious reasons, not least among them, "it is always dangerous to shoot at the king."[22] However, when "there is a breach in the academic fortress ... the next line of defense, in some instances, is the court."[23] This is one of those instances.
¶ 124 McAdams, as he had done many times before, wrote a blog post on a matter of public concern calling into question the prevailing orthodoxy on Marquette's campus.[24] The impetus for this particular blog post arose after an undergraduate student, J.D., turned to McAdams for help because J.D. was troubled by how his Philosophy teacher (who was a graduate student), and Marquette's Philosophy Department Chair Nancy Snow and Assistant Chair Sebastian Luft had shut down his attempt to understand why the topic of same sex marriage had been censored during a class discussion. Abbate invited J.D. to drop the class and Snow told him to "change his attitude so he comes across as less insolent and disrespectful," later calling him a "little twit" and a "jackass" in email exchanges with colleagues. Absurdly, Marquette's Faculty Hearing Committee would later support its disciplinary recommendation against McAdams by citing Marquette's Guiding Values, which obligate professors to "respect the dignity of others" to "acknowledge their right to express differing opinions" and to "nurture an inclusive, diverse community that fosters ... vigorous yet respectful debate."
¶ 125 McAdams reached out to Abbate for comment, but Abbate declined the opportunity to respond. The blog post reported on the student's experience and discussed McAdams' political view of popular tactics used for "shutting people up." It was critical of Marquette and of censorship. Unlike the Philosophy Department faculty's criticisms of J.D., it did not contain any intemperate language or ad hominem attack. The blog post did not contain a call to action or make any demands inciting violence or attack. In fact, Marquette's Dean of Arts and Sciences did not believe the post was harmful to Abbate at all and Abbate apparently agreed, remarking: "When I saw the blog I was pleasantly surprised."
¶ 126 Despite her pleasant surprise, Abbate flamed this fire. She drafted a formal letter of complaint insisting that Marquette discipline McAdams for the blog. Abbate also asserted she had been "the target of harassing emails, sent by [McAdams'] followers," although as of the date of that statement, Abbate had only received a single email critical of her. Two weeks later, Abbate threatened to sue Marquette and subject it to adverse publicity, unless the University acceded to her demands that the University fire McAdams, punish J.D., and pay "reparations" to her.[25]
*753 ¶ 127 J.D. and Abbate each shared their respective sides of the story with online news sources-J.D. with College Fix[26] and Abbate with the Daily Nous.[27] Other news sources picked up the story and it became national news.[28] After the story went viral, Abbate received numerous emails, some in support, some critical, and others vile and threatening.
¶ 128 Marquette found itself embroiled in a controversy it did not initiate. In response, it suspended McAdams from teaching, banished him from campus, and initiated disciplinary proceedings against him. After hearings, the Faculty Hearing Committee (FHC) recommended McAdams be suspended without pay. Marquette's President, Michael Lovell, accepted the FHC's recommendation but as a condition of reinstatement as a member of the faculty, demanded McAdams express his "deep regret"-a proviso reminiscent of forced confessions of guilt for imaginary crimes in oppressive regimes. Instead of abiding by its contract, which guaranteed academic freedom, Marquette breached it. As the court correctly holds, McAdams' blog post plainly falls within the definition of academic freedom under McAdams' contract.
¶ 129 Marquette subjected a tenured professor to discipline for writing something that triggered an adverse response from third parties over whom he has no control, thereby holding McAdams responsible for the actions of third parties. Allowing this retribution to stand would set a dangerous precedent, leading faculty to self-censor for fear of third-party reactions to speech and post hoc disapproval of it. If universities impose culpability on professors for the actions of others, it will undoubtedly cause the same chilling effect and result in the same stifling of expression that led the Supreme Court to strike down the legal imposition of "not-a-communist" promises, loyalty pledges, and disclosures of association in Keyishian, Weiman, and Shelton, respectively. And academic freedom would be severely wounded, perhaps fatally.
VI
¶ 130 "And though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously by licensing and prohibiting to misdoubt her strength. Let her and Falsehood grapple; who ever knew Truth put to the worse, in a free and open encounter." John Milton, Areopagitica 166-67 (James Russell Lowell ed., 1890) (1644).
¶ 131 Academic freedom is deeply entrenched in the history of this country and its college campuses. Universities are unique places for intellectual growth, where both students and professors can "follow truth wherever it may lead." Those who engage in the pursuit of truth, who propound ideas and challenge others, must enjoy the freedom to speak on matters of *754 public concern without the sword of Damocles menacing their discourse.
¶ 132 "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." Sweezy, 354 U.S. at 251, 77 S.Ct. 1203. Suppression of viewpoints confronting the current cultural orthodoxy would surely lead to academic stagnation and imperil the future of America. If institutional silencing of non-majority viewpoints replaces the search for truth, higher education becomes nothing more than an echo chamber of familiar and recycled perspectives, and the dialectic dies with it.
¶ 133 The court ensures the dialectic is alive and well in Wisconsin, and academic freedom along with it. I join the majority opinion in full.

Dr. Susan Mountin, What is Ignatian Pedagogy?, Marquette University Explore Series, http://www.marquette.edu/mission/IgnatianPedagogy.php (last visited June 25, 2018).

See J. Peter Byrne, Academic Freedom: A "Special Concern of the First Amendment", 99 Yale L.J. 251 (1989) (explaining that institutional autonomy is a key facet of academic freedom); David M. Rabban, A Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 256 (1990), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=4057 & context=lcp; Donna R. Euben, Academic Freedom of Individual Professors and Higher Education Institutions: The Current Legal Landscape, American Association of University Professors 6 (May 2002), https://www.aaup.org/sites/default/files/files/Academic%20Freedom%20-%20Whose%20Right%20(WEBSITE%20COPY)_6-26-02.pdf.

See, e.g., Powell v. Syracuse Univ., 580 F.2d 1150, 1154 (2d Cir. 1978) (explaining that institutional academic freedom does not embrace the freedom to discriminate).

See Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d 4, 15 (D.C. Cir. 2008) (Edwards, J., concurring); Judith Areen, Government as Educator: A New Understanding of First Amendment Protection of Academic Freedom and Governance, 97 Geo. L.J. 945, 953-66 (2009).

The 1940 Statement had its genesis much earlier, in 1915, when the AAUP's Committee on Academic Freedom and Academic Tenure formulated a "Declaration of Principles." In 1970, "interpretive comments" were added to the 1940 Statement clarifying certain statements and illuminating the intent of others.

See Aaron Nisenson, Faculty Rights in the Classroom, Academe, Sept.-Oct. 2017, at 10, https://www.aaup.org/article/faculty-rights-classroom#.WykylGrwZhE ("[M]any colleges and universities have adopted, either in whole or in substantial part, AAUP policies on academic freedom, tenure, and governance in faculty handbooks, faculty contracts, or collective bargaining agreements.").

See Marquette University Statutes on Faculty Appointment, Promotion and Tenure § 307.07, http://www.marquette.edu/provost/_includes/documents/FacultyhandbooklastupdatedMay82018numbered.pdf.; compare American Association of University Professors, Recommended Institutional Regulations on Academic Freedom and Tenure 79, 83-84, https://www.aaup.org/file/RIR%202014.pdf (last visited June 25, 2018).

The majority accuses this dissent of proffering a "formless notion of what shared governance ought to be" rather than grounding its interpretation in the language of the Faculty Statutes. See majority op., ¶ 58. I acknowledge that the Faculty Statutes define the FHC as an "advisory" board. Faculty Statute § 307.07(1). However, the faculty statutes also include the bargained-for procedural safeguards giving the faculty the imperative to weigh in prior to any adverse employment action. See Faculty Statute § 307.07. The "form" of shared governance is provided by these procedural safeguards, which the majority discards as a "distraction."

The majority exhorts that this dissent would end the University's "carefully balanced shared governance" by "turning a cooperative relationship into an adversarial contest." See majority op., ¶ 89. But the facts of this case fail to bear this out. Indeed, in this case the faculty, who the majority indicates "tries to expand its own sphere of academic freedom at the expense of the other," unanimously determined that McAdams' conduct was unprotected. Id.

I also observe that professors like those who make up the FHC are likely to support a robust academic freedom doctrine. The members of the FHC are not only sitting in judgment of a colleague, but interpreting the rules that govern themselves. It is telling that this group of people unanimously arrived at the conclusion that McAdams' conduct crossed the line.

Marquette University Statute on Faculty Appointment, Promotion and Tenure § 306.03 defines "discretionary cause" as inclusive of:
[T]hose circumstances, exclusive of absolute cause, which arise from a faculty member's conduct and which clearly and substantially fail to meet the standard of personal and professional excellence which generally characterizes University faculties, but only if through this conduct a faculty member's value will probably be substantially impaired. Examples of conduct that substantially impair the value or utility of a faculty member are: serious instances of illegal, immoral, dishonorable, irresponsible, or incompetent conduct. In no case, however, shall discretionary cause be interpreted so as to impair the full and free enjoyment of legitimate personal or academic freedoms of thought, doctrine, discourse, association, advocacy, or action.

The record reflects that at the time of the events at issue in this case, Abbate was a graduate student in the philosophy department at Marquette. In addition to working on her dissertation, in the fall of 2014 Abbate taught two sections of Theory of Ethics, a philosophy class for undergraduates. I observe that throughout its opinion, the majority cherry-picks facts when it refers to Abbate as an "instructor" and not a "student." See, e.g., majority op., ¶ 1. In doing so, it colors the facts, disregarding the realities of the power dynamics at play here between a tenured professor and a graduate student.

I also observe the potential effects of the majority opinion on the uninhibited exchange of ideas between faculty and students at Marquette. The direct effect of the majority's decision is to condone or acquiesce in professors' publicly subjecting students to ridicule and harassment. But it also sends an indirect message that may chill the exchange between faculty and students, lest they find themselves in the same position as Abbate.

The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law ... abridging the freedom of speech...." Over the years, "Congress" has been defined as any government actor. See, e.g., Matal v. Tam, 582 U.S. ----, 137 S.Ct. 1744, 1757, 198 L.Ed.2d 366 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech' ").

In his argument before the FHC, McAdams advanced a different interpretation of this language. He maintained that the provision was intended to give Marquette faculty members the same right vis-à-vis Marquette that government employees have under the First Amendment to their employers. Although neither party argues ambiguity here, it appears that such an argument could be made given the varied interpretation advanced by McAdams. The First Amendment rights of a private citizen are not coterminous with the First Amendment rights of an employee of a government employer. See, e.g., Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

American Association of University Professors, Recommended Institutional Regulations on Academic Freedom and Tenure 79, 83, https://www.aaup.org/file/RIR%202014.pdf (last visited June 25, 2018).

See, e.g., Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (speech intended and likely to incite imminent lawless action); Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words).

Marquette Faculty Statute § 307.07(2) provides in relevant part:
A faculty member who has been awarded tenure at Marquette University may only be dismissed upon a showing of absolute or discretionary cause, as these terms are defined by the Handbook for Full-Time Faculty (hereinafter University Statutes), Section 306.02 (absolute cause) or 306.03 (discretionary cause). Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights guaranteed them by the United States Constitution.

Spurgeon, supra note 20, at 130.

Id.

McAdams has been employed as a professor at Marquette since 1977. Marquette granted him tenure in 1989.

A short time later, Abbate left Marquette for University of Colorado.

Matt Lamb, Student told he can't openly disagree with gay marriage in class at Jesuit college, The C. Fix (Nov. 17, 2014), http://www.thecollegefix.com/post/20138/.

Justin Weinberg, Philosophy Grad Student Target of Political Smear Campaign, Daily Nous (Nov. 18, 2014), http://dailynous.com/2014/11/18/philosophy-grad-student-targetof-political-smear-campaign/.

See, e.g., Colleen Flaherty, Ethics Lesson, Inside Higher Ed (Nov. 20, 2014), https://www.insidehighered.com/news/2014/11/20/marquette-u-grad-student-shes-being-targeted-after-ending-class-discussion-gay; Todd Starnes, Teacher to student: If you don't support gay marriage, drop my class, Fox News: Opinions (Nov. 22, 2014), http://www.foxnews.com/opinion/2014/11/22/teacher-to-student-if-dont-support-gay-marriage-drop-my-class.html.